RICHARD B. WOLF, SB# 046173
  E-Mail: rwolf@lbbslaw.com
ELISE D. KLEIN, SB# 111712
  E-Mail: klein@lbbslaw.com
JANELLE F. GARCHIE, SB# 118453
  E-Mail: garchie@lbbslaw.com
KRISTIN P. KYLE de BAUTISTA, SB# 221750
  E-Mail: kyledebautista@lbbslaw.com
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
650 West "C" Street, Suite 800
San Diego, California 92101
Telephone: (619) 233-1006
Facsimile: (619) 233-8627

Attorneys for HEALTH NET OF CALIFORNIA, INC.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

FREDA SUSSMAN,

                    Plaintiff,

        v.

ARMELIA SANI, M.D., SHILEY EYE
CENTER, UCSD MEDICAL CENTER,
REGENTS OF THE UNIVERSITY OF
CALIFORNIA, HEALTH NET, INC.,
HEALTH NET SENIORITY PLUS,
LINDA BEACH, HAIDEE
GUTIERREZ, and DOES 1 through 40,
inclusive,

                    Defendants.

CASE NO. 08 CV 0392 H BLM

Honorable Marilyn L. Huff
Action Removed: March 3, 2008

**DEFENDANT HEALTH NET OF
CALIFORNIA, INC.'S APPENDIX
OF UNPUBLISHED FEDERAL
AUTHORITIES IN CITED IN ITS
REPLY BRIEF IN SUPPORT OF
MOTION TO DISMISS PURSUANT
TO FEDERAL RULES OF CIVIL
PROCEDURE 12(b)(1) AND 12(b)(6)**

[Filed currently with Reply Brief in
support of Motion to Dismiss]

DATE:    April 21, 2008
TIME:    10:30 a.m.
CTRM:   13

        Defendant Health Net of California, Inc. hereby submits the following

appendix of unpublished federal authorities cited in the reply brief in support of its

motion to dismiss Plaintiff Freda Sussman's Complaint:

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

4834-8040-3714.1

| **Authority** | **Exhibit** |
|---|---|
| *Clay v. Permanente Medical Group, Inc.,*<br>2007 U.S. Dist. LEXIS 94670 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 1 | |
| *Drissi v. Kaiser Foundation Hospitals, Inc.,*<br>2008 U.S. Dist. LEXIS 2125 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 2 | |
| *Lassiter v. Pacificare Life & Health Ins. Co.,*<br>2007 U.S. Dist. LEXIS 91970 (M.D. Ala. 2007) . . . . . . . . . . . . . . . . . . . . . . 3 | |
| *Masey v. Humana, Inc.,*<br>2007 U.S. Dist. LEXIS 63556 (M.D. Fla. 2007) . . . . . . . . . . . . . . . . . . . . . . 4 | |
| *Masey v. Humana, Inc.,*<br>2007 U.S. Dist. LEXIS 70464 (M.D. Fla. 2007) . . . . . . . . . . . . . . . . . . . . . . 5 | |
| *Williams v. Viva Health, Inc.,*<br>2007 U.S. Dist. LEXIS 5639 (M.D. Ala. 2008) . . . . . . . . . . . . . . . . . . . . . . . 6 | |

DATED: April 14, 2008          LEWIS BRISBOIS BISGAARD & SMITH LLP


By: /s/ KRISTIN P. KYLE de BAUTISTA
    RICHARD B. WOLF
    ELISE D. KLEIN
    JANELLE F. GARCHIE
    KRISTIN P. KYLE de BAUTISTA
    Attorneys for Defendant Health Net of
    California, Inc.
    E-Mail: kyledebautista@lbbslaw.com

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

# EXHIBIT "1"

1 of 1 DOCUMENT

**DEBORAH CLAY, an individual and as the Successor in Interest to the Estate of RODNEY CLAY; RODNEY CLAY, JR.; VELICIA HAMILTON; TAMIKO MOON; and THOMASINA CLAY, Plaintiffs, v. THE PERMANENTE MEDICAL GROUP, INC.; KAISER FOUNDATION HOSPITALS; KAISER FOUNDATION HEALTH PLAN; and DOES 1-200, inclusive, Defendants.**

NO. 06-7926 SC

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 94670*

**December 14, 2007, Decided
December 14, 2007, Filed**

**SUBSEQUENT HISTORY:** Related proceeding at *Drissi v. Kaiser Found. Hosps., Inc.,* 2008 U.S. Dist. LEXIS 2125 (N.D. Cal., Jan. 3, 2008)

**COUNSEL:** [*1] For Deborah Clay, an individual and as the Successor in Interest to the Estate of Rodney Clay, Rodney Keith Clay, Jr., Velicia Hamilton, Tamiko Moon, Thomasina Clay, Plaintiffs: Mark G. Crawford, LEAD ATTORNEY, Lopez, Hodes, Restaino, Milman & Skikos, San Francisco, CA; Thomas Andrew Schultz, Lopez Hodes Restaino et al, San Francisco, CA.

For The Permanente Medical Group, Inc., Kaiser Foundation Hospitals, Kaiser Foundation Health Plan, Defendants: Brian Soo Lee, Kennedy Park Richardson, Yvonne Michelle Pierrou, LEAD ATTORNEYS, Jordan Otto Posamentier, Marion's Inn, Oakland, CA; Ronald Russel Lamb, LEAD ATTORNEY, Wilke Fleury Hoffelt Gould & Birney LLP, Sacramento, CA; Mark Aaron Palley, Attorney at Law, Marion's Inn, Oakland, CA.

**JUDGES:** Samuel Conti, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Samuel Conti

**OPINION**

*ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION*

## I. *INTRODUCTION*

Plaintiffs Deborah Clay, individually and as the successor in interest to the estate of Rodney Clay, Rodney Clay, Jr., Velicia Hamilton, Tamiko Moon, and Thomasina Clay ("Plaintiffs") brought this suit against the Permanente Medical Group, Inc., Kaiser Foundation Hospitals, and Kaiser Foundation Health Plan ("Health Plan") (collectively [*2] "Defendants" or "Kaiser"), asserting nine claims related to Kaiser's alleged mishandling of a kidney transplant for Rodney Clay. *See* Notice of Removal, Docket No. 1, Ex. A ("Complaint"). Defendants removed the action from the Alameda County Superior Court to this Court, asserting jurisdiction pursuant to the Medicare Act, *42 U.S.C. § 1395 et seq.,* and the Employee Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C. § 1001, et seq. See id.* Defendants now move the Court to compel arbitration of all claims other than the claim for injunctive relief, and to stay this action pending arbitration. Mot. to Compel Arbitration ("Motion"), Docket No. 8. Plaintiffs filed an Opposition to the Motion, and Defendants filed a Reply. *See* Docket Nos. 27, 28. The parties appeared before the Court and argued the merits of the Motion on November 30, 2007.

Having considered all of the arguments and submissions of the parties, the Court hereby GRANTS Defendants' Motion.

## II. *BACKGROUND*

In November 1991, Deborah Clay enrolled herself and her husband Rodney Clay as members of the Health Plan, pursuant to an agreement between the Health Plan and her employer, Integrated Device Technology. Dean Decl. P 3. [*3] In 1994, the Health Plan entered into a Medicare Risk Contract with the Health Care Financing Administration to provide medical and hospital services for enrolled Medicare beneficiaries. [1] *See* Hall Decl. PP 2, 4.

> 1 The Health Care Financing Administration was renamed the Centers for Medicare & Medicaid Services ("CMS"). Hall Decl. P 2. The Medicare Risk Contract was renamed Medicare+Choice Contract in 1999, and then renamed again as Medicare Advantage. *Id.* P 3. The Court will use the current terms, CMS and Medicare Advantage.

When a Health Plan member expressed interest in enrolling in the Health Plan Senior Advantage program (Health Plan's name for its Medicare Advantage offering), Health Plan sent the member copies of the Health Plan Senior Advantage Election form and the Health Plan Senior Advantage Membership Agreement, also known as the Evidence of Coverage ("EOC"). Hall Decl P 5. The EOC summarizes the Health Plan Senior Advantage coverage, and is subject to the Health Plan's Medicare Advantage contract with the CMS. *Id.* The Health Plan Senior Advantage EOC has always contained an arbitration clause. *Id.*

The Health Plan revises the EOC annually. *Id.* P 6. Each year, the Health Plan [*4] submits to the CMS its proposed changes to the EOC for the following year. *Id.* Once CMS approves the changes, Health Plan mails a copy of the EOC and a letter summarizing the revisions to all Health Plan Senior Advantage enrollees. *Id.*

In July 2000, Rodney Clay enrolled as a member of the Health Plan Senior Advantage. *See* Dean Decl. P 4. On the Senior Advantage Election form which Mr. Clay signed, the following text appears above his signature:

> I have read, understand, and agree to the statements on the reverse side of this Election Form including the restrictions on the use of non-Plan providers. I hereby apply for Kaiser Permanente Senior Advantage membership. I understand that except for Small Claims Court cases and claims subject to the Medicare Appeals

> Procedure, any claim that I, my heirs, or other claimants associated with me, assert for alleged violation of any duty arising out of or relating to membership in Health Plan, including any claim for medical or hospital malpractice, for premises liability, or relating to the coverage for, or delivery of services, or items, irrespective of legal theory, must be decided by binding arbitration under California law and not by a lawsuit [*5] or resort to court process except as California law provides for judicial review of arbitration proceedings. I agree to give up my right to a jury trial and accept the use of binding arbitration.

*Id.* Ex. C. Mr. Clay's coverage under the Health Plan Senior Advantage program became effective on August 1, 2000. *Id.* P 4.

Plaintiffs are the wife and grown children of Rodney Clay. Compl. PP 3-7. Plaintiffs allege as follows. In early 2000, Mr. Clay suffered kidney failure. Because Kaiser did not at that time operate its own kidney transplant center, Kaiser referred Mr. Clay to the UCSF Medical Center's kidney transplant program. *Id.* PP 29, 31. UCSF informed Mr. Clay that the typical wait was two to three years for a replacement kidney. *Id.* P 31. Four years later, when Mr. Clay was supposedly near the top of the UCSF transplant list, Kaiser informed Mr. Clay that it had opened a transplant center and that he would be transferred to the Kaiser program that September. *Id.* PP 32, 33. Finally, Plaintiffs allege that in the year following Mr. Clay's transfer to the Kaiser transplant program, Kaiser repeatedly delayed the transplant, only to refer him back to UCSF. *Id.* P 37. Before Kaiser completed [*6] the paperwork necessary for the transfer, Rodney Clay died of chronic renal failure. *Id.* P 39.

Based on these allegations, Plaintiffs brought nine causes of action against Kaiser: (1) survival and wrongful death based on negligence; (2) fraud, deceit, and fraudulent concealment; (3) negligent misrepresentation; (4) negligence *per se;* (5) intentional infliction of emotional distress; (6) negligent infliction of emotional distress; (7) violation of *California Business & Professions Code section 17200, et seq.;* (8) violation of *California Business & Professions Code section 17500, et seq.;* and (9) wrongful death due to breach of contract and tortious breach of the implied covenant of good faith

and fair dealing. *See id.* Plaintiffs seek to recover compensatory and punitive damages, attorneys' fees and costs, and injunctive relief.

Defendants asked if Plaintiffs would agree to submit this dispute to arbitration. Plaintiffs refused. Lamb Decl. P 2. Defendants therefore brought this Motion.

## III. *ANALYSIS*

### A. *Applicability of the Federal Arbitration Act*

*Section 2* of the Federal Arbitration Act ("FAA") provides that "a contract evidencing a transaction involving commerce to settle by arbitration [*7] a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 u.S.C. *§ 2*. Kaiser asserts that Health Plan's Senior Advantage Election Form involves commerce, and that the arbitration provision in that document is therefore enforceable under the FAA. *See* Mot. at 5-6. The Supreme Court has interpreted the phrase "involving commerce" very broadly, holding that it extends beyond "persons or activities within the flow of interstate commerce" to include anything that affects commerce. *See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273, 277, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995).* In certain circumstances, the Health Plan pays for its members to receive medical services when they are traveling outside of California. *See* Hall Decl. Ex. A at 11, 16. Health Plan also provides coverage authorized by Medicare, a federal statute exercising the Commerce power. Applying the broad legal standard described above, the Court concludes that Health Plan's Senior Advantage Election form evidences a transaction involving commerce, and that the FAA is therefore applicable. Other courts [*8] have reached the same conclusion. *See Schlegel v. Kaiser Found. Health Plan, Inc., No. 07-CV-00520-MCE, 2007 U.S. Dist. LEXIS 64299, *3-4 (E.D. Cal. Aug. 30, 2007); Mannick v. Kaiser Found. Health Plan, Inc., No. C 03-5905 PJH, 2005 U.S. Dist. LEXIS 40405, *6-7 (N.D. Cal. Dec. 16, 2005); Toledo v. Kaiser Permanente Med. Group, 987 F. Supp. 1174, 1180 (N.D. Cal. 1997).*

Where a valid and enforceable written arbitration agreement governs a dispute in litigation, the FAA authorizes the Court to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. . . ." *9 U.S.C. § 3.* "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. . . . The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1., 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983).*

### B. *California Health & Safety Code Section 1363.1*

The FAA encourages arbitration where there is a valid and enforceable agreement. Here, Plaintiffs argue that the arbitration agreement contained in the [*9] enrollment form Mr. Clay signed is unenforceable because it violates the notice and disclosure requirements of *California Health & Safety Code section 1363 .1.*

*Section 1363.1* establishes conditions for any health care service plan that "includes terms that require binding arbitration to settle disputes and that restrict, or provide for a waiver of, the right to a jury trial. . . ." *Cal. Health & Safety Code § 1363.1.* Plaintiffs assert that Defendants' arbitration agreement violates *Section 1363.1(b)*, which requires that the arbitration agreement be "prominently displayed on the enrollment form signed by each subscriber or enrollee;" *Section 1363.1(c)*, which requires that the arbitration agreement be "substantially expressed in the wording provided in *subsection (a) of Section 1295* of the Code of Civil Procedure;" and *Section 1363.1(d)*, which requires that the disclosure be displayed "immediately before the signature line for the individual enrolling in the health care plan." *Id.*

Under California law, compliance with *Section 1363.1* is mandatory, and failure to comply voids an arbitration agreement:

> *Section 1363.1*, therefore, establishes the requirements that *must be satisfied* in order [*10] to arbitrate disputes involving a health care service plan. Accordingly, even though *section 1363.1* is silent on the effect of noncompliance, because the disclosure requirements are mandatory, the failure to comply with those requirements renders an arbitration provision unenforceable.

*Malek v. Blue Cross of Cal., 121 Cal. App. 4th 44, 64, 16 Cal. Rptr. 3d 687 (Ct. App. 2004)* (emphasis in original) .

## C. *The Medicare Act Preempts Section 1363.1*

Although Defendants assert that their enrollment form and EOC comply with *Section 1363.1*, their primary position is that the Court need not consider *Section 1363.1* because it is preempted by the Medicare Act. [2] The Court agrees.

> 2  Defendants initially took the position that the FAA also preempts application of *Section 1363.1*, but abandoned this argument in their Reply and did not assert it at oral argument. *See* Reply at 1 ("Defendants acknowledge that the McCarran-Ferguson Act immunizes *section 1363.1, Calif. Health & Safety Code*, from what would otherwise be a clear-cut case of preemption by the Federal Arbitration Act."); *see also Smith v. Pacificare Behavioral Health of Cal., Inc., 93 Cal. App. 4th 139, 162, 113 Cal. Rptr. 2d 140 (Ct. App. 2001)* (" [T]he FAA, a federal statute of general [*11] application, which does not 'specifically relate' to insurance, is foreclosed from application to prevent the operation of *section 1363.1*.").

### 1. *Preemption Standards*

"Where (as here) Congress regulates a field historically within the police powers of the states (public health), we proceed from the assumption that state law is not superseded unless there is a 'clear and manifest purpose of Congress' to foreclose a particular field to state legislation." *Pagarigan v. Sup. Ct. of Los Angeles County, 102 Cal. App. 4th 1121, 1128, 126 Cal. Rptr. 2d 124 (Ct. App. 2002)* (citing *Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996))*.

Preemption may be either express or implied. *Id.* "[W]hen Congress has 'unmistakably. . . ordained,' that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall." *Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977)* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963))*. Implied preemption may take either of two forms:

> Absent explicit pre-emptive language, we have recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the [*12] inference that Congess left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Gade v. Nat'l Solid Wastes Mgmt, Ass'n, 505 U.S. 88, 98, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992)* (internal citations and quotations omitted).

Where there is a question about the scope of a statute's preemptive effect, courts look to the congressional purpose, "as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic, 518 U.S. at 485*.

### 2. *Applicable Law*

The Court examines the Medicare Act "as it read at the time relevant to this case." *See McCall v. Pacificare of Cal., 25 Cal. 4th 412, 422, 106 Cal. Rptr. 2d 271, 21 P.3d 1189 (2001)*. Congress amended the preemption provisions of the Medicare Act in 2000 and in 2003. *See* Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000, H.R. 5661, enacted by Pub. L. No. 106-554, 114 Stat. 2763 (2000) ("BIPA"); Medicare Prescription [*13] Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003) ("MMA").

Mr. Clay enrolled in the Health Plan Senior Advantage program in July, 2000. The front of the enrollment form mentions binding arbitration in a block of text immediately preceding Mr. Clay's signature, but it also says, "Please read the Conditions of Election and Authorization to Exchange Information on the back of this form." Dean Decl. Ex. C. [3] On the back of that form, the first paragraph appears as follows:

> Conditions of Election
>
> If you are electing Kaiser Permanente Senior Advantage Coverage, be certain that you fully understand the arbitration

provision, benefits, limitations and conditions, which are described in the Kaiser Permanente Senior Advantage Group Disclosure Form and Evidence of Coverage or the Individual Membership Agreement and Disclosure Form and Evidence of Coverage.

*Id.* Ex. D. The Court interprets this text to mean that the full terms of the enrollee's agreement with Defendants, including the arbitration provision, are set forth in the Senior Advantage Group Disclosure Form and Evidence of Coverage. Jason Hall, Health Plan's Director of Medicare Compliance, testified [*14] by declaration that Health Plan sends the current EOC to any Health Plan member who expressed interest in the Senior Advantage Program. Hall Decl. P 5. Hall further states that the EOC has always contained an arbitration provision. *Id.* Each year, when Health Plan sends its proposed revisions to the EOC to CMS for review, it sends an Annual Notice of Changes describing the revisions to each Senior Advantage enrollee, followed by a copy of the final, approved EOC. *Id.* P 6.

> 3    This text appears in bold print, in a different font from other parts of the enrollment form, and is surrounded by a black box which separates it from the rest of the form. *See* Dean Decl. Ex. C. At oral argument, Plaintiffs' counsel repeatedly drew the Court's attention to this box as an example of Defendants' ability to highlight important text on the enrollment form, purportedly to support Plaintiffs' claim that the arbitration provision was not itself prominently displayed.

The series of events purportedly giving rise to Plaintiff's claims appears to have begun on June 22, 2004, when Defendants told Mr. Clay he would have to transfer out of the UCSF transplant program and into Kaiser's program. *See* Compl. P 33. [*15] The operative version of the EOC, then, is the version that took effect on June 1, 2004. *See* Hall Decl. Ex. A. The Health Plan submitted this version to the CMS for review during 2004. *See id.*

Because the events giving rise to this suit took place in 2004, and the arbitration provision governing the suit was executed in that year (by CMS-approved amendment to the prior EOC), the Court concludes that the applicable version of the Medicare Act is that which was in effect in

June of 2004, and which remains in effect today.

*3. Preemption Analysis*

The Medicare Act explicitly preempts application of state law to the arbitration agreement at issue here. After the most recent amendment, the Medicare Act preempts all state regulation of Medicare Advantage plans not relating to licensing or plan solvency:

> Relation to State laws. The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

*42 U.S.C. § 1395w-26(b)(3).* The standards established under this statute include *42 C.F.R. § 422.80*, "Approval of marketing materials [*16] and election forms," and *42 C.F.R. § 422.111*, "Disclosure requirements." These regulations set forth the rules governing approval and distribution of Medicare Advantage information to enrollees.

Specifically, *42 C.F.R. § 422.80 (c)* provides the guidelines for CMS review of Medicare Advantage marketing materials. The CMS review process checks to make sure that the disclosure is printed in a proper format and text size. *Id. § 422.80(c)(1).* The CMS also reviews the marketing materials to determine whether they include an "[a]dequate written explanation of the grievance and appeals process, including differences between the two, and when it is appropriate to use each." *Id. § 422.80(c)(1)(iii).*

These regulations apply to all "marketing materials," as that term is defined in *42 C.F.R. § 422.80(b).* This includes any informational materials targeted at Medicare Advantage beneficiaries which, among other things, "explain the benefits of enrollment in an MA plan, or *rules that apply to enrollees.*" *Id. § 422.80(b)(3)* (emphasis added). The regulation provides a number of examples of marketing materials, including, "[m]embership communication materials such as membership rules, subscriber agreements [*17] (*evidence of coverage*), member handbooks and wallet card instructions to enrollees." *Id. § 422.80(b)(5)(v)* (emphasis added).

The operative arbitration provision in this dispute is contained in the June 2004 EOC. By federal regulation, the EOC is considered "marketing material" and must be approved by the CMS. The CMS has a set of standards it uses in evaluating marketing materials, including the adequacy of the formatting and font size and the adequacy of the description of any grievance procedures. Pursuant to *42 U.S.C. § 1395w-26(b)(3)*, these regulations supersede any state law or regulation with respect to Medicare Advantage plans such as the Health Plan Senior Advantage plan in which Mr. Clay was enrolled. To the extent *California Health & Safety Code section 1363.1* purports to regulate the adequacy of any disclosures in the EOC, it is superseded by federal law, and its application here is preempted.

Congressional intent confirms this result. The Conference Report accompanying the MMA clearly demonstrates that, in amending *42 U.S.C. 1395w-26*, Congress intended to broaden the preemptive effects of the Medicare statutory regime, and that it intended to apply the new rules to all subsequent [*18] litigation:

> The conference agreement clarifies that the MA program is a federal program operated under Federal rules. State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency. There has been some confusion in recent court cases. This provision would apply prospectively; thus, it would not affect previous and ongoing litigation.

H.R. Rep. NO. 108-391, at 557 (2003).

At oral argument, Plaintiffs' counsel advanced two arguments against preemption. First, counsel asserted that because *Section 1363.1* does not conflict with federal law - that is, compliance with one does not require violation of the other - federal law does not preempt. Second, counsel relied on the decision in *Pagargigan,* where the California Court of Appeal, on very similar facts, found that the Medicare Act did not preempt application of *Section 1363.1. See 102 Cal. App. 4th at 1135-36.* Both arguments fail because they rely on older versions of the Medicare Act.

Prior to the passage of the BIPA in 2000, Congress had not explicitly preempted state regulation of Medicare

Advantage marketing materials. As such, preemption analysis required a court to consider [*19] whether compliance with both federal and state law was possible. In that situation, it was permissible for states to impose higher standards than federal law did. Because the preemption is now explicit, the state regulations must fall. *See Jones, 430 U.S. at 525.*

The *Pagarigan* court followed the implied preemption analysis in reaching its conclusion that *Section 1363.1* was not preempted. *See 102 Cal. App. 4th at 1147* ("As Congress has expressly stated, state standards regarding matters outside the specified areas are superseded *only* to the extent any state regulation is '*inconsistent*' with such federal regulations." (citing previous version of *42 U.S.C. § 1395w-26(b)(3)(A))* (emphasis in original). Under the facts of that case, application of the older preemption statute was appropriate. Pagarigan had enrolled in the Medicare program in 1995, the governing EOC had been approved in January 2000, and Pagarigan died in June 2000. *Id. at 1149.* All of this preceded passage of the BIPA, when Congress first made the decision to explicitly preempt state regulation of Medicare marketing materials such as the EOC. *Id.* The same was true in *Zolezzi v. Pacificare of Cal., 105 Cal. App. 4th 573, 129 Cal. Rptr. 2d 526 (Ct. App. 2003),* [*20] on which Plaintiffs also rely. *Id. at 588* ("However, that provision was added by BIPA's amendment of the Act on December 21, 2000, which was subsequent to all of the relevant or operative acts and omissions of which Zolezzi complains in her first amended complaint."). Here, the explicit preemption was well-established before the CMS reviewed and approved the governing EOC, and before Defendants are alleged to have committed any of the wrongful acts identified in the Complaint. Nothing in *Pagarigan* compels a different result.

## D. *Applicability of the Arbitration Agreement to Plaintiffs*

Plaintiffs argue that because they are not signatories to the arbitration agreement, even if the Court finds that agreement enforceable, it should not apply to them. Opp'n at 11. Defendants argue that the arbitration provisions in the applicable EOC extend to the enrollee's heirs or personal representatives (i.e., Plaintiffs), and that because Plaintiffs bring claims on behalf of the estate, they stand in Mr. Clay's shoes and are bound by his agreement.

The EOC includes the following provisions regarding the scope of arbitration:

> Any dispute shall be submitted to binding arbitration if all of the following [*21] requirements are met:
>
> 1. The claim arises from or is related to an alleged violation of any duty incident to or arising out of relating to this EOC or a Member Party's relationship to Kaiser Foundation Health Plan, Inc., (Health Plan), including any claim for medical or hospital malpractice, for premises liability, or relating to the coverage for, or delivery of, Services, irrespective of the legal theories upon which the claim is asserted.
>
> 2. The claim is asserted by one or more Member Parties against one or more Kaiser Permanente Parties or by one or more Kaiser Permanente Parties against one or more Member Parties.

Hall Decl. Ex. A (2004-2005 EOC), at 35-36. [4] The EOC further defines "Member Parties" to include the plan member, the member's heir or personal representative, or any "person claiming that a duty to him or her arises from a Member's relationship to one or more Kaiser Permanente Parties." *Id.* at 36.

> 4    The EOC includes other requirements not material to this dispute.

Because Mr. Clay agreed to the terms of the EOC, his estate is bound by its terms. Therefore, the various causes of action in the Complaint which are brought on behalf of the estate must be submitted to arbitration. [*22] At a minimum, this includes the first, second, third, and fourth causes of action, each of which alleges that Defendants caused some financial injury to Mr. Clay and seeks to recover for that injury. *See County of Los Angeles v. Super. Ct., 21 Cal. 4th 292, 304, 87 Cal. Rptr. 2d 441, 981 P.2d 68 (1999)* ("In a survival action by the deceased plaintiff's estate, the damages recoverable expressly exclude 'damages for pain, suffering, or disfigurement.'" . . . They do, however, include all 'loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages.'") (citing *Cal. Code Civ. Proc. § 377.34*).

Plaintiffs correctly identify a split in the California Courts of Appeals regarding the applicability of binding arbitration provisions to non-signatory adult heirs. Two lines of cases may apply. The first follows *Rhodes v. California Hospital Medical Center, 76 Cal. App. 3d 606, 143 Cal. Rptr. 59 (Ct. App. 1978)*; the second follows *Herbert v. Superior Court of Los Angeles County, 169 Cal. App. 3d 718, 215 Cal. Rptr. 477 (Ct. App. 1985)*. Though Plaintiffs identify the split, they fail to provide any reason the Court should follow one line of cases over the other in this matter.

Plaintiffs rely on *Rhodes* and [*23] its progeny. For the reasons set forth in *Herbert*, on which Defendants rely, *Rhodes* is distinguishable. Unlike the arbitration provision in *Herbert* and the one in the EOC, the agreement in *Rhodes* did not have a provision through which the signing party intended to bind her heirs. *See Herbert, 169 Cal. App. 3d at 725 n.2; Rhodes, 76 Cal. App. 3d at 608-09.* It is also relevant that in *Rhodes*, the estate was not a plaintiff and there were no survival claims at issue. *See Rhodes, 76 Cal. App. 3d at 609* ("This arbitration proceeding does not, at this stage, involve any question as to the existence of a cause of action in Mrs. Rhodes. . . . We are here concerned solely with the forum in which a new cause of action in the heirs may be brought.").

Similarly, in *Baker v. Birnbaum, 202 Cal. App. 3d 288, 292, 248 Cal. Rptr. 336 (Ct. App. 1988)*, which follows *Rhodes*, there was "nothing on the face of the . . . contract that extend[ed] it to any claim by" the plaintiff. Other facts in *Baker* distinguish it from the present matter as well. The suit did not involve a claim for wrongful death, and the plaintiff, who was not required to arbitrate, was not suing on behalf of a decedent's estate. *Id. at 290.* As discussed [*24] below, in reference to *Herbert*, each of these factors is significant. In *Baker*, a husband and wife each brought claims against the wife's doctor. The wife's claim was for negligence, the husband's for loss of consortium. *Id. at 290.* The court compelled arbitration of Mrs. Baker's claim because she had signed the arbitration agreement, but not Mr. Baker's claim. *Id. at 292.*

Plaintiffs' final authority, *Buckner v. Tamarin, 98 Cal. App. 4th 140, 119 Cal. Rptr. 2d 489 (Ct. App. 2002)*, is also distinguishable. In *Buckner*, the decedent had signed an arbitration agreement purporting to bind his heirs. *Id. at 141.* His grown children brought an action for wrongful death. *Id.* Unlike the present action, the

Case 3:08-cv-00392-H-BLM    Document 15-2    Filed 04/14/2008    Page 11 of 46

2007 U.S. Dist. LEXIS 94670, *24                                    Page 8

decedent's spouse was not a co-plaintiff and the plaintiffs did not bring any claims on behalf of the estate. Here, the Plaintiffs include, in addition to Mr. Clay's grown children, his wife, suing individually and on behalf of his estate. As noted above, the estate must submit to arbitration. The *Buckner* court distinguished its facts from those in the *Herbert* line of cases in part because there was no plaintiff or group of plaintiffs in *Buckner* that was required to arbitrate, so there was no concern of splitting [*25] a wrongful death suit across forums or reaching inconsistent results. *Id.* at 142-43.

The Court finds the facts in *Herbert* more analogous, and adopts the reasoning of that case and its progeny. The *Herbert* plaintiffs were the wife, five minor children, and three adult children of the decedent. *169 Cal. App. 4th at 720.* They brought a suit for wrongful death, fraud, and negligent infliction of emotional distress against hospital, health plan, and doctors involved in Mr. Herbert's care. *Id.* at 721. The decedent's estate also filed claims for medical negligence and fraud, but those claims were dropped after the defendants filed a motion to compel arbitration. *Id.* As here, the arbitration agreement in *Herbert* applied to any claim brought by the health plan member or his heir or personal representative. *Id.* at 720. The court found that the decedent's wife was bound by the arbitration agreement. *Id.* at 723. The court relied on a prior decision which found that the fiduciary relationship between spouses establishes the power to contract for health care on one another's behalf, which implies the authority to agree on one another's behalf to arbitrate claims arising out of that health care. *Id.* [*26] (citing *Hawkins v. Super. Ct., 89 Cal. App. 3d 413, 418-19, 152 Cal. Rptr. 491 (Ct. App. 1979)).* Here, Rodney and Deborah Clay were both enrolled in the Health Plan through Deborah Clay's employer, and Deborah Clay remains enrolled. Dean Decl. P 3. That is sufficient basis to bind Mrs. Clay to the arbitration provisions.

The *Herbert* court found that because some of the plaintiffs were bound by the arbitration agreement, the remaining plaintiffs had to submit their wrongful death claims to arbitration, regardless of the fact that they had signed the agreement. *169 Cal. App. 3d at 725.* Under the "one action rule," "there may be only a single action for wrongful death, in which all heirs must join. There cannot be a series of such suits by individual heirs." *Gonzales v. S. Cal. Edison Co., 77 Cal. App. 4th 485, 489, 91 Cal. Rptr. 2d 530 (Ct. App. 1999).* "Because a

wrongful death cause of action may not be split, the case must be tried in a single forum." *Herbert, 169 Cal. App. 3d at 722.*

In addition to the one action rule requiring that all the heirs litigate together, the *Herbert* court identified other policy concerns favoring arbitration of all the heirs' claims:

> [I] it is obviously unrealistic to require the signatures of all [*27] the heirs, since they are not even identified until the time of death, or they might not be available when their signatures are required. Furthermore, if they refused to sign they should not be in a position possibly to delay medical treatment to the party in need. Although wrongful death is technically a separate statutory cause of action in the heirs, it is in a practical sense derivative of a cause of action in the deceased.

*Id.* at 725. The *Herbert* facts are very similar to those now before the Court, and the *Herbert* reasoning is persuasive. The Court therefore holds that the arbitration agreement in the EOC, which binds the estate and Mrs. Clay, also binds the remaining Plaintiffs.

## IV. *CONCLUSION*

For the reasons set forth above, the Court GRANTS Defendants' Motion to Compel Arbitration and ORDERS as follows:

> 1. Plaintiffs are hereby ORDERED to submit all claims other than that seeking injunctive relief to binding arbitration.

> 2. This action is hereby stayed pending the outcome of the arbitration, pursuant to *9 U.S.C. § 3.*

IT IS SO ORDERED.

December 14, 2007

/s/ Samuel Conti

Samuel Conti

2007 U.S. Dist. LEXIS 94670, *27

UNITED STATES DISTRICT JUDGE

# EXHIBIT "2"

1 of 1 DOCUMENT

**MOURHIT DRISSI; KARIM DRISSI; SARAH DRISSI; MOURHIT DRISSI as Successor in Interest for the Estate of COLLEEN DRISSI, deceased, Plaintiffs, v. KAISER FOUNDATION HOSPITALS, INC.; KAISER FOUNDATION HEALTH PLAN, INC.; THE PERMANENTE MEDICAL GROUP; and DOES 1-25, inclusive, Defendants.**

No. 07-1980 SC

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2008 U.S. Dist. LEXIS 2125*

**January 3, 2008, Decided**
**January 3, 2008, Filed**

**PRIOR HISTORY:** *Clay v. Permanente Med. Group, 2007 U.S. Dist. LEXIS 94670 (N.D. Cal., Dec. 14, 2007)*

**COUNSEL:** [*1] For Mourhit Drissi, Karim Drissi, Sarah Drissi, Mourhit Drissi, Successor in Interest for the Estate of Colleen Drissi, deceased, Plaintiffs: Mark Joseph Zanobini, LEAD ATTORNEY, Timothy G. Tietjen, Rouda Feder Tietjen & Zanobini, San Francisco, CA.

For Kaiser Foundation Hospitals, Inc., Kaiser Foundation Health Plan, Inc., The Permanente Medical Group, Defendants: Jordan Otto Posamentier, LEAD ATTORNEY, Marion's Inn, Oakland, CA; Mark Aaron Palley, Attorney at Law, Oakland, CA; Ronald Russel Lamb, Wilke Fleury Hoffelt Gould & Birney LLP, Sacramento, CA.

**JUDGES:** Samuel Conti, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Samuel Conti

**OPINION**

*ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION*

**I. INTRODUCTION**

Plaintiffs Mourhit Drissi, Karim Drissi, and Sarah Drissi ("Plaintiffs") are the spouse and adult children of Colleen Drissi, who they allege died as a result of the inadequate care she received from defendants while awaiting a kidney transplant. Plaintiffs bring this suit on their own behalf and on behalf of the estate of Colleen Drissi, alleging causes of action for wrongful death, concealment, and conspiracy.

Defendants Kaiser Foundation Hospitals, Inc., Kaiser Foundation Health Plan, Inc. ("Health Plan"), and [*2] the Permanente Medical Group (collectively "Defendants" or "Kaiser") removed the suit from the San Francisco County Superior Court to this Court, claiming federal question jurisdiction arising under the provisions of Part C of the Medicare Act, *42 U.S.C. § 1395w-21 et seq.*

Defendants move the Court to compel Plaintiffs to submit all causes of action to binding arbitration pursuant to an arbitration agreement Mrs. Drissi purportedly signed when she enrolled in the Health Plan. Plaintiffs assert that the arbitration agreement is unenforceable because it violates *California Health & Safety Code section 1363.1*, which imposes certain standards on health care service plans that require binding arbitration. Defendants maintain that the California law is inapplicable because it is preempted by the Medicare Act.

This Order follows quickly on the Court's recent Order Granting Defendants' Motion to Compel

Arbitration in the related case, *Clay v. Permanente Medical Group, Inc.,* No. 06-7926, 2007 U.S. Dist. LEXIS 94670 . *See* Docket No. 15 ("*Clay* Order"). The facts and legal issues are largely similar, as is the Court's conclusion. The Court issues this Order separately to address minor, but relevant, factual differences.

The parties [*3] have fully briefed the issues, and counsel for both parties participated in oral argument before the Court in the *Clay* matter. Having considered all of the submissions and arguments, the Court hereby GRANTS Defendants' Motion to Compel Arbitration.

## II. *BACKGROUND*

Colleen Drissi enrolled in the Health Plan under a group agreement between Health Plan and her employer, San Juan Unified School District. Dean Decl. P 2. Mrs. Drissi was a Health Plan member from the time she enrolled, in October 1990, until her death in January 2005.

Mrs. Drissi suffered kidney problems and, in 2000, she was placed on the waiting list for a kidney transplant. At that time, Defendants did not operate their own kidney transplant program, so Defendants paid for Mrs. Drissi to receive medical care through the kidney transplant program at U.C. Davis.

The Health Plan Senior Advantage is a program under which the Health Plan provides Medicare services to plan members, pursuant to an agreement with the Centers for Medicare & Medicaid Services ("CMS"). In 2003, Mrs. Drissi enrolled in the Health Plan Senior Advantage program. According to Jason Hall, Health Plan's Director of Medicare Compliance, when a Health Plan member [*4] requests information regarding the Senior Advantage program, Health Plan sends the member an enrollment kit containing the Election Form and a copy of the Evidence of Coverage ("EOC"). The Election Form Mrs. Drissi signed included a notice, in bold text surrounded by a box and highlighted with a different background color from the rest of the page, stating, "Please read the Conditions of Election and Authorization to Exchange Information on the back of this form. Sign and date below." Dean Decl. Ex. D. Beneath that box, the following text appeared:

> I understand that, except for Small Claims Court cases and claims subject to a Medicare appeals procedure, any dispute

between myself, my heirs, or other associated parties on the one hand and Health Plan, its health care provides, or other associated parties on the other hand, for alleged violation of any duty arising out of or related to membership in Health plan, including any claim for medical or hospital malpractice, for premises liability, or relating to the coverage for, or delivery of services or items, irrespective of legal theory, must be decided by binding arbitration under California law and not by lawsuit or resort to court process, [*5] except as applicable law provides for judicial review of arbitration proceedings. I agree to give up my right to a jury trial and accept the use of binding arbitration. I understand that the arbitration provision is contained in the *Evidence of Coverage.*

*Id.* On the back of the Election Form the following paragraph appeared under the bold heading "Conditions of Election":

> If you are electing Kaiser Permanente Senior Advantage Coverage, be certain that you fully understand the arbitration provision, benefits, limitations, and conditions, which are described in the Kaiser Permanente Senior Advantage Group Disclosure Form and Evidence of Coverage or the Individual Membership Agreement and Disclosure Form and Evidence of Coverage. The above documents may be found in the enrollment kit, and it is available through your group benefits administrator, or made available by calling the Kaiser Permanente Member Service Call Center. . . ."

*Id.* Ex. E. The Health Plan amended the EOC annually, and sent each member a summary of the amendments, as well as the final amended EOC approved by the CMS.

In June 2004, Defendants informed Mrs. Drissi that they were opening their own kidney transplant program in [*6] San Francisco, and would therefore no longer cover the cost of her care at U.C. Davis or U.C. San Francisco. At the time, Mrs. Drissi was supposedly near the top of the waiting list for a new kidney in the U.C.S.F. program. In September 2004, Mrs. Drissi

Case 3:08-cv-00392-H-BLM    Document 15-2    Filed 04/14/2008    Page 16 of 46

Page 3
2008 U.S. Dist. LEXIS 2125, *6

transferred to the Kaiser transplant program. A few months later, without undergoing a transplant, Mrs. Drissi died from complications arising out of her kidney problems.

During the second half of 2004 and beginning of 2005, when Mrs. Drissi was transferred to Kaiser's kidney transplant program, the then-current EOC contained the following provisions for binding arbitration:

> For all claims subject to this "Binding Arbitration" section, both Claimants and Respondents give up the right to a jury or court trial, and accept the use of binding arbitration. Insofar as this "Binding Arbitration" section applies to claims asserted by Kaiser Permanente Parties, it shall apply retroactively to all unresolved claims that accrued before the effective date of this *EOC*. Such retroactive application shall be binding only on the Kaiser Permanente Parties.

> Scope of Arbitration

> Any dispute shall be submitted to binding arbitration if all of the following [*7] requirements are met:

> 1. The claim arises from or is related to an alleged violation of any duty incident to or arising out of or relating to this *EOC* or a Member Party's Relationship to Kaiser Permanente Health Plan, Inc. (Health Plan), including any claim for medical or hospital malpractice, for premises liability, or relating to the coverage for, or delivery of, Services, irrespective of the legal theories upon which the claim is asserted.

> 2. The claim is asserted by one or more Member Parties against one or more Kaiser Permanente Parties or by one or more Kaiser Permanente Parties against one or more Member Parties.

Hall Decl. Ex. C.

Plaintiffs filed this suit alleging wrongful death,

concealment, and conspiracy. Defendants asked if Plaintiffs would submit the matter to binding arbitration. Plaintiffs refused, and Defendants brought this motion.

### III. PREEMPTION ANALYSIS

*Section 2* of the Federal Arbitration Act ("FAA") provides that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for [*8] the revocation of any contract." *9 U.S.C. § 2*. Rather than belabor the point, the Court adopts its reasoning from *Clay,* and holds that the FAA is applicable here. *See Clay* Order at 5-6.

Plaintiffs assert that the arbitration agreement violates *California Health & Safety Code section 1363.1,* and is therefore unenforceable. *See Malek v. Blue Cross of Cal., 121 Cal. App. 4th 44, 64, 16 Cal. Rptr. 3d 687 (Ct. App. 2004).* Defendants respond that application of *section 1363.1* is preempted by the Medicare Act.

"[W]hen Congress has 'unmistakably. . . ordained,' that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall." *Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977)* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963)).* Here, Congress has unmistakably ordained that Medicare preempts all state regulation:

> Relation to State laws. The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

*42 U.S.C. § 1395w-26(b)(3).* The standards established under this [*9] statute govern the approval and distribution of marketing materials, such as the EOC. *See, e.g., 42 C.F.R. §§ 422.80, 422.111.* Specifically, *42 C.F.R. § 422.80(c)* provides the guidelines for CMS review of Medicare Advantage marketing materials. The CMS review process checks to make sure that the disclosure is printed in a proper format and text size. *Id. § 422.80(c)(1).* The CMS also reviews the marketing

materials to determine whether they include an "[a]dequate written explanation of the grievance and appeals process, including differences between the two, and when it is appropriate to use each." *Id. § 422.80(c)(1)(iii).*

As *California Health & Safety Code section 1363.1* purports to regulate the adequacy of disclosures regarding arbitration agreements imposed by health plans, the foregoing federal regulations preempt its application to Medicare marketing materials. [1] The Court therefore cannot apply *section 1363.1* to invalidate the arbitration provision of the EOC governing the relationship between Mrs. Drissi and Defendants.

> 1    A more detailed analysis of preemption, including discussion of the congressional purpose in amending the Medicare preemption provision, is set forth in the *Clay* [*10] Order at pages 7-15. That reasoning is equally applicable here, and the Court therefore adopts it. The only difference on this issue here is that the *Clay* decedent had signed his enrollment form for the Health Care Senior Advantage in 2000, and the *Clay* plaintiffs argued that under the then-applicable standards, *section 1363.1* was not preempted. As Mrs. Drissi did not enroll in the Health Plan Senior Advantage until 2003, there is no need to consider the pre-2000 version of the statute.

## IV.    APPLICABILITY OF THE EOC TO NON-SIGNATORY PLAINTIFFS

Plaintiffs argue that because they did not agree to the arbitration agreement, they cannot be bound by it, even if it would have bound Mrs. Drissi. On this issue, Defendants rely on *Herbert v. Superior Court of Los Angeles County, 169 Cal. App. 3d 718, 215 Cal. Rptr. 477 (Ct. App. 1985),* and its progeny. In *Herbert,* the court held that the non-signatory plaintiffs had to submit their wrongful death claims to arbitration. *Id. at 725.* Plaintiffs identify a split in the California authority, directing the Court to *Rhodes v. California Hospital Medical Center, 76 Cal. App. 3d 606, 143 Cal. Rptr. 59 (Ct. App. 1978),* and subsequent decisions following it. As in *Clay,* the Court finds the *Herbert* [*11] authority more persuasive. [2]

> 2    Again, a complete analysis comparing *Herbert* and *Rhodes* appears in the *Clay* Order, which the Court adopts here as well.

One factual difference between *Clay* and the present matter warrants discussion, however. In *Clay,* the deceased and his spouse were both members of the same health plan. *Clay* Order at 18-19. This was relevant because previous California decisions suggested that the authority to secure health care for one's spouse implies the authority to require the spouse to arbitrate claims arising out of that health care. *See id.* (citing *Herbert, 169 Cal. App. 3d at 723; Hawkins v. Super. Ct., 89 Cal. App. 3d 413, 418-19, 152 Cal. Rptr. 491 (Ct. App. 1979)).* Here, there is no evidence that Mr. Drissi is a member of the Health Plan, so it is less clear that Mrs. Drissi could bind Mr. Drissi to the arbitration agreement.

None of the authority cited by the parties addresses this distinction. Plaintiffs' cases are distinguishable here for the same reasons they were in *Clay.* The arbitration agreement in *Rhodes* lacked a provision purporting to bind the decedent's heirs to the arbitration agreement. *76 Cal. App. 3d at 608-09.* Also unlike the present case, the *Rhodes* plaintiffs [*12] did not include the decedent's estate. *Id. at 609.* The same distinctions apply to *Baker v. Birnbaum, 202 Cal. App. 3d 288, 290-92, 248 Cal. Rptr. 336 (Ct. App. 1988).* Finally, in *Buckner v. Tamarin, 98 Cal. App. 4th 140, 119 Cal. Rptr. 2d 489 (Ct. App. 2002),* neither the decedent's estate nor the decedent's spouse was a plaintiff. *Id. at 141-43.*

Of the cases reviewed by the Court, *Herbert* is the most applicable. The Court must determine, however, if the fact that Mr. and Mrs. Drissi were not members of the same health plan is relevant. The *Hawkins* decision, on which *Herbert* relied, noted that, "[s]pouses have mutual obligations to care for and support the other . . . , including the obligation to provide medical care . . . , and they occupy a fiduciary relationship to each other." *89 Cal. App. 3d at 418-19* (internal citations omitted). The support obligations have a statutory origin. *See id.* (citing *Cal. Civ. Code § 242* (repealed and replaced by *Cal. Fam. Code § 4300*)). The *Hawkins* court concluded that these obligations give one spouse the power to contract for medical care on behalf of the other. *Id. at 419.* The court recognized that in similar situations, where one party has the power to contract for medical care on another's [*13] behalf, he or she may also agree on the other's behalf to arbitrate. *Id.* (citing *Madden v. Kaiser Found. Hosps., 17 Cal. 3d 699, 131 Cal. Rptr. 882, 552 P.2d 1178 (1976)*(parent can bind child to arbitration when securing care for child); *Doyle v. Giuliucci, 62 Cal. 2d 606, 43 Cal. Rptr. 697, 401 P.2d 1 (1965)*(state can

bind employees to arbitration when negotiating group health care on their behalf)).

In both *Herbert* and *Hawkins,* the decedent and his or her spouse were enrolled in the same medical plan. *See Herbert, 169 Cal. App. 3d at 723-24; Hawkins, 89 Cal. App. 3d at 418-19.* However, the decedent's authority to bind the spouse to arbitrate was based upon the authority to provide for medical care, not the actual provision of care. That is, it appears that the fiduciary duties and obligations of spouses to provide medical care for one another are sufficient basis for binding one another to arbitration agreements. Thus, Mrs. Drissi's agreement that her heirs would arbitrate claims arising from her membership in the Health Plan Senior Advantage binds Mr. Drissi. Because both Mrs. Drissi's estate and Mr. Drissi are bound to arbitrate, the remaining Plaintiffs must also arbitrate their claims for wrongful death. *See Herbert, 169 Cal. App. 3d at 725-26* [*14] (describing the policy underlying the "one-action rule" for wrongful death suits).

## V. *CONCLUSION*

For the reasons set forth above, the Court GRANTS Defendants' Motion to Compel Arbitration and ORDERS as follows:

> 1. Plaintiffs are hereby ORDERED to submit all claims to binding arbitration.

> 2. This action is hereby stayed pending the outcome of the arbitration, pursuant to *9 U.S.C. § 3.*

IT IS SO ORDERED.

January 3, 2008

/s/ Samuel Conti

UNITED STATES DISTRICT JUDGE

# EXHIBIT "3"

1 of 1 DOCUMENT

**ROY LASSITER, et al., Plaintiffs, v. PACIFICARE LIFE & HEALTH INSURANCE COMPANY, et al., Defendants.**

**CASE NO. 2:07-cv-583-MEF**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

*2007 U.S. Dist. LEXIS 91970*

**December 13, 2007, Decided
December 13, 2007, Filed**

**NOTICE:** RECOMMENDED FOR PUBLICATION

**COUNSEL:** [*1] For Roy Lassiter, Jennifer Purifoy, Plaintiffs: James Matthew Stephens, Rodney Eugene Miller, LEAD ATTORNEYS, McCallum Methvin & Terrell PC, Birmingham, AL; L. Cooper Rutland, Jr., LEAD ATTORNEY, Rutland & Braswell, Union Springs, AL; Robert G. Methvin, Jr., LEAD ATTORNEY, McCallum, Methvin & Terrell, Birmingham, AL.

For Pacificare Life and Health Insurance Company, United Healthcare Services, Inc., as successor in interest to Pacificare Life & Health Company, Defendants: George Bryan Harris, Philip Henry Butler, William Claude McGowin, LEAD ATTORNEYS, Bradley Arant Rose & White, LLP, Montgomery, AL; John K. Edwards, Paula Denney, LEAD ATTORNEYS, Jackson Walker, L.L.P., Houston, TX.

Robert D. Bell, Defendant, Pro se, Shellman, GA.

Robert D. Bell, Cross Defendant, Pro se, Shellman, GA.

**JUDGES:** Mark E. Fuller, CHIEF UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Mark E. Fuller

**OPINION**

**MEMORANDUM OPINION AND ORDER**

This cause is now before the Court on Plaintiffs's Motion to Remand (Doc. # 9). Plaintiffs originally filed their complaint in the Circuit Court for Bullock County, Alabama, alleging fraud and other state law claims against Pacificare Life and Health Insurance Company ("Pacificare") [1] and Robert Bell ("Bell"), one [*2] of Pacificare's sales agents, for conduct arising out of the purchase of a Pacificare Medicare insurance policy. Defendants argue that this Court has subject matter jurisdiction over the Plaintiffs' claims under the doctrine of complete preemption. The Court has thoroughly considered the submissions of the parties in support of and in opposition to the motion. For the reasons set forth in this Memorandum Opinion and Order, the Court finds that subject matter jurisdiction is lacking. Therefore, the Motion to Remand is due to be GRANTED.

> 1   On December 20, 2005, Pacificare merged with United Healthcare Services, Inc. Plaintiffs have sued both Pacificare, as well as United Healthcare Services as a successor in interest. For simplicity, this opinion will refer to both of these entities collectively as "Pacificare".

**I. FACTS AND PROCEDURAL HISTORY**

Prior to May 23, 2005, Plaintiffs obtained health care services through Medicare parts A and B. Through Medicare, Plaintiffs were able to obtain medical services from any medical service provider anywhere in the country that accepted Medicare. In May 2005, Plaintiffs were approached by Bell, a Pacificare sales agent, for the purpose of soliciting their [*3] enrollment in Pacificare's "Secure Horizons" plan, which is a "Medicare

Advantage" plan, a privately-run managed care service operating under Medicare parts C and D. Plaintiffs elected to enroll in the Secure Horizons plan based on the representations of the sales agent. However, by enrolling in Secure Horizons, Plaintiffs were only covered for medical services provided by medical providers in the Pacificare network.

Plaintiffs claim that the true nature of the Secure Horizons plan was misrepresented to them, and that they were misled to believe that they could continue to visit their regular healthcare providers. Plaintiffs continued to visit their regular doctors and have incurred bills as a result of these uncovered services. On May 23, 2007, Plaintiffs filed this claim in the Circuit Court for Bullock County, Alabama, alleging various state law tort claims against Pacificare and Bell. On June 25, 2007, Defendants removed the case to this court on the grounds that Plaintiffs' claims are completely preempted by federal law. On July 17, 2007, Plaintiffs filed the instant Motion to Remand the case back to state court.

## II. DISCUSSION

The Defendants argue that this Court has jurisdiction [*4] because the Plaintiffs' state law claims are completely preempted by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"). Federal courts are courts of limited jurisdiction. *See, e.g., Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994); Burns v. Windsor Ins. Co., 31 F.3d 1092, 1095 (11th Cir. 1994).* As such, they may only hear cases that they have been authorized to hear by the Constitution or the Congress of the United States. *Kokkonen, 511 U.S. at 377.* The burden of establishing that subject matter jurisdiction exists rests upon the party asserting jurisdiction. *Id.* Pacificare, as the removing party, bears the burden of proving federal jurisdiction in this case. *See, e.g., Leonard v. Enterprise Rent a Car, 279 F.3d 967, 972 (11th Cir. 2002).* Pacificare's sole argument for federal jurisdiction is that the 2003 amendment to *42 U.S.C. § 1395w-26(b)(3)* completely preempts Plaintiffs' state law claims.

A civil action filed in a state court may be removed to federal court if the claim is one "arising under" federal law. *Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 6, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003).* In order to determine whether a complaint "arises under" federal [*5] law, a court must examine the "well pleaded"

allegations of the complaint and ignore potential defenses. *Id.* A suit arises under the Constitution and laws of the United States only when the plaintiffs statement of his own cause of action shows that it is based upon federal law or the Constitution. *Id.* As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim. *Id.* However, a state claim may be removed to federal court under two narrow exceptions to the well pleaded complaint rule: (1) when Congress expressly provides for removal, or (2) when a federal statute wholly displaces the state-law cause of action through complete preemption. *Id. at 8.*

Consequently, federal jurisdiction exists only if the doctrine of complete preemption applies. Complete preemption is to be distinguished from ordinary preemption. In their brief, Pacificare confuses the two doctrines by citing cases applying ordinary preemption rather than complete preemption. Ordinary preemption is an *affirmative defense*, which may be raised in both state and federal court, when a plaintiff's state law claims are substantively displaced by federal [*6] law. *Geddes v. American Airlines, Inc., 321 F.3d 1349, 1352 (11th Cir. 2003).* In contrast, complete preemption is a *jurisdictional rule* for assessing federal jurisdiction when a complaint purports to raise only state law claims. *Id. at 1353.*

No circuit court of appeals has addressed the question before this Court of whether the MMA completely preempts state law claims and thereby confers federal jurisdiction. However, the issue has been addressed by other district courts. In *Harris v. Pacificare Life & Health Ins. Co., 514 F. Supp. 2d 1280, 2007 WL 2846477 (M.D. Ala. 2007)* (DeMent, J.), Pacificare attempted to remove state law claims arising out of the sale of a Medicare insurance policy on the ground that *§ 1395w-26(b)(3)* demonstrated Congress's intent for the MMA to completely preempt state law claims, which is the exact same argument they are making to this Court. In *Harris*, Judge DeMent held that the MMA did not completely preempt state law claims because it does not create an exclusive cause of action. *See Harris, 514 F. Supp. 2d 1280, 2007 WL 2846477, at * 10-12.* Furthermore, Judge Granade reached the same conclusion in *Bolden v. Healthspring of Ala., Inc., No. CV07-413, 2007 U.S. Dist. LEXIS 77950 (S.D. Ala. October 2, 2007).* [*7] This Court is aware that one court has held that the MMA does completely preempt state law claims.

*See Dial v. Healthspring of Ala., Inc., 501 F. Supp. 2d 1348 (S.D. Ala. 2007).*

This Court is persuaded by the reasoning in *Harris* and *Bolden* that the MMA does not completely preempt state law claims. A federal statute does not completely preempt state law claims unless Congress intended the federal statute to provide the "exclusive cause of action." *See Beneficial Nat'l Bank, 539 U.S. at 8; Geddes, 321 F.3d at 1353* ("The Supreme Court has cautioned that complete preemption can be found only in statutes with 'extraordinary' preemptive force. Moreover, that 'extraordinary' preemptive force must be manifest in the clearly expressed intent of Congress." (internal citations omitted)). The MMA provides in *§ 1395w-26(b)(3)* that "The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part."

This language is not sufficient to demonstrate a clear intent by Congress to create an exclusive private federal remedy. *See* [*8] *Harris, 514 F. Supp. 2d 1280, 2007 WL 2846477, at *11-12.* Indeed, Pacificare compares this language to the preemption language in the Employee Retirement Income Security Act of 1974 ("ERISA") § 514(a), codified at *29 U.S.C. § 1144(a).* While ERISA is one of the few statutes where the Supreme Court has found complete preemption, it is well settled that *complete* preemption arises from ERISA's civil

enforcement scheme in *§ 502(a),* codified at *29 U.S.C. § 1132(a),* and that § 514(a) establishes only *ordinary* preemption. *See Butero v. Royal Maccabees Life Ins. Co., 174 F.3d 1207, 1211-12 (11th Cir. 1999).* Accordingly, *§ 1395w-26(b)(3)* is insufficient to establish a clear Congressional intent that the MMA provides an exclusive private federal remedy. Therefore, this Court lacks jurisdiction over the Plaintiffs' claims and the case must be remanded back to the state court.

## III. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that:

(1) Plaintiff's Motion to Remand (Doc. # 9) is GRANTED;

(2) This case is REMANDED to the Circuit Court for Bullock County, Alabama;

(3) Any other pending motions are left for resolution by the Circuit Court for Bullock County, Alabama; and

(4) The Clerk is DIRECTED to take appropriate [*9] steps to promptly effect the remand.

DONE this the 13th day of December, 2007.

/s/ Mark E. Fuller

CHIEF UNITED STATES DISTRICT JUDGE

# EXHIBIT "4"

2 of 2 DOCUMENTS

**DARLY L. MASEY, individually and on behalf of all others similarly situated, Plaintiff, v. HUMANA, INC. and CAREMARK RX, Inc., Defendants.**

CASE NO. 8:06-CV-1713-T-24EAJ

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

*2007 U.S. Dist. LEXIS 63556*

August 16, 2007, Decided
August 16, 2007, Filed

**SUBSEQUENT HISTORY:** Adopted by, in part, Complaint dismissed at *Masey v. Humana, 2007 U.S. Dist. LEXIS 70464 (M.D. Fla., Sept. 24, 2007)*

**COUNSEL:** [*1] For Daryl L. Masey, individually and on behalf of all others similarly situated, Plaintiff: Christa L. Collins, J. Andrew Meyer, LEAD ATTORNEYS, James, Hoyer, Newcomer & Smiljanich, P.A., Tampa, FL; Jordan M. Lewis, Wood R. Foster, Jr., LEAD ATTORNEYS, Siegel, Brill, Greupner, Duffy & Foster, P.A., Minneapolis, MN.

For Humana, Inc., Defendant: Brian D. Boyle, LEAD ATTORNEY, O'Melveny & Myers LLP, Washington, DC; Edward Martin Waller, Jr., LEAD ATTORNEY, Fowler, White, Boggs & Banker, PA, Tampa, FL; Stephen D. Brody, LEAD ATTORNEY, O'Melveny & Myers, LLP, Washington, DC.

For Caremark RX, Inc., Defendant: Martin J. Bishop, Robert H. Griffith, LEAD ATTORNEYS, Foley & Lardner LLP, Chicago, IL; Thomas F. Munro, LEAD ATTORNEY, Adam R. Alaee, Foley & Lardner, LLP, Tampa, FL.

**JUDGES:** ELIZABETH A JENKINS, United States Magistrate Judge.

**OPINION BY:** ELIZABETH A JENKINS

**OPINION**

***REPORT AND RECOMMENDATION***

This cause comes before the Court on **Defendant Humana, Inc.'s Motion to Dismiss** (Dkt. 43), **Plaintiff's Response in Opposition to Defendant's Motion to Dismiss** (Dkt. 44), **Defendant Caremark Rx, Inc.'s Motion to Dismiss** (Dkt. 57) and **Plaintiff's Response in Opposition to Defendant's Motion to Dismiss** (Dkt. 60). These matters have [*2] been referred by the District Judge for a report and recommendation (Dkt. 73). Oral argument has been held.

*I. Background Facts*

Plaintiff, an enrollee in Defendant Humana Inc.'s ("Humana") Medicare Advantage health care plan, was treated for breast cancer in 2006 which required chemotherapy. [1] (Dkt. 35 at 1, P 2) As part of her chemotherapy treatment, Plaintiff was injected with various cancer treating drugs. (Dkt. 35 at 2, P 3) Plaintiff alleges that her chemotherapy drugs should have been covered under Medicare Part B, which covers 100 percent of the costs of injectable and infusible drugs that are not usually self-administered and that are furnished and administered as part of a physician service. (*Id.*) Plaintiff asserts that Humana incorrectly characterized her chemotherapy drugs as covered by Medicare Part D. (Dkt. 35 at 2, PP 4-5) Plaintiff alleges that once she surpassed the $ 2,250 prescription drug Medicare Part D coverage cap, she was required to pay 100 percent of the next $ 3,600 in drug charges, and 5 percent of any charges after paying the $ 3,600 amount. (*Id.*) Because Humana incorrectly designated the chemotherapy drugs as covered by Medicare Part D, Plaintiff contends [*3] that Humana improperly required her to pay for these drugs which cost her "thousands of dollars." (Dkt. 35 at

3, P 7; at 7, P 25)

    1  Although Plaintiff's amended complaint does not specify the dates she received chemotherapy, the parties agree that she was treated for cancer in 2006.

Furthermore, Plaintiff alleges that Humana has every incentive to classify chemotherapy drugs under Medicare Part D because it profits from this miscategorization. (Dkt. 35 at 7, P 28) In particular, Plaintiff alleges that when Humana designates drugs as covered by Medicare Part D, Humana is reimbursed by the Government for nearly the full retail costs of medicines. (*Id.*) In contrast, Plaintiff alleges that Humana is reimbursed at a steep discount for drugs covered by Medicare Part B. (*Id.*)

Under state law, Plaintiff alleges the following claims against Humana: (1) breach of contract; (2) third party beneficiary breach of contract; (3) breach of fiduciary duty; and, (4) violations of Kentucky's consumer protection law. (Dkt. 35 at 10-14, Counts I through IV) Count V of Plaintiff's amended complaint alleges that Humana subcontracted out certain prescription drug and benefit management responsibilities to Caremark [*4] RX, Inc. ("Caremark"). (Dkt. 35 at 13, P 71) Plaintiff contends that Caremark breached its contract with Humana by classifying Medicare Part B drugs to enrollee's Medicare Part D coverage. (Dkt. 35 at 13, P 73) Plaintiff asserts a third party beneficiary breach of contract claim against Caremark. Jurisdiction is based on diversity of citizenship. (Dkt. 35 at 4, P 12)

Plaintiff brings this class action on behalf of herself and other similarly situated enrollees in Humana's plan. Plaintiff seeks a jury trial and the following relief: (1) certification of the class; (2) an order enjoining Defendants from improperly charging Medicare Part D those medicine charges that are properly chargeable to Part B; (3) an order requiring Defendants to pay as damages those out-of-pocket medical charges that Plaintiff and the class have been required to pay because of Defendants' improper classification of chemotherapy drugs; (4) an order requiring disgorgement of all profits relating to improper classification of the chemotherapy drugs; and (5) an order requiring Defendants to pay for Plaintiff's reasonable attorneys' fees and costs, interest and other relief the Court deems fair and equitable. (Dkt. [*5] 35 at 14)

Defendants move to dismiss the amended complaint on the grounds that Plaintiff's state law claims are preempted by federal law governing Medicare benefits and Plaintiff has failed to exhaust the administrative appeals required by the Medicare statute for benefit claims. In reference to Plaintiff's breach of third party beneficiary contract claim against Caremark, Caremark first contends that neither Caremark nor one of Caremark's subsidiaries had a contract with Humana at the time Plaintiff was receiving her chemotherapy treatment. Second, Caremark asserts that, even if Caremark's contract had not terminated with Humana, Caremark had no responsibility to determine how drugs are classified under Medicare. Third, Caremark argues that this claim should be dismissed because, under the agreement between Caremark and Humana, there is no express benefit conveyed to Plaintiff.

A. *Statutory and Regulatory Framework*

The federal government provides health care to elderly and disabled Americans under the Medicare program. *42 U.S.C. § 1395 et seq.* The Secretary of the Department of Health and Human Services ("HHS" or "Secretary") oversees the program while the Centers for Medicare and Medicaid [*6] Services ("CMMS") administers the program.

Part A of the Medicare program provides insurance for the cost of hospital and related post-hospital services. *42 U.S.C. § 1395c.*

Medicare Part B provides supplemental benefits for physician and out-patient services.*Id. at 1395k.* Part B pays for "medical and other health services," which is defined to include physician services, services incident to physician services, home dialysis supplies and equipment, institutional dialysis and supples and diagnostic laboratory tests. *Id. at 1395k, 1395x(s).* Part B also covers "hospital services (including drugs and biologicals which are not usually self-administered by the patient)" to the extent the services are "incident to physicians' services rendered to outpatients and partial hospitalization services incident to such services." *Id. at 1395x(s); 42 C.F.R § 410.10(b)-(c).* Agency regulations determine whether a service is incident to a physician's services or outpatient hospital services. *42 C.F.R. §§ 410.26-27.*

Medicare Part B covers a limited number of prescription drugs, including injectable cancer treatment

Case 3:08-cv-00392-H-BLM    Document 15-2    Filed 04/14/2008    Page 26 of 46

Page 3
2007 U.S. Dist. LEXIS 63556, *6

drugs, immunosuppressive drugs, certain oral anti-cancer drugs, and influenza and hepatitis [*7] vaccines. *See 68 Fed. Reg. 50,428, 50,429 (Aug. 20, 2003).* Through Medicare Part B, the government reimburses health care providers for up to 80 percent of the allowable costs of covered prescription drugs. *See In Re Pharm. Indus. Average Wholesale Price Litig., 460 F. Supp. 2d 277, 279 (D. Mass. 2006).*

In 1997, Congress added the Medicare Part C, then known as the Medicare+Choice ("M+C") program to the Medicare plan. The M+C program was intended to allow beneficiaries to have access to a wide array of private health plan choices in addition to traditional fee-for-service Medicare. *See Matthews v. Leavitt, 452 F.3d 145 n.1 (2nd Cir. 2006).* In 2003, the M+C program was replaced by the Medicare Advantage ("MA") program, which provides Part A and Part B benefits (and sometimes Part D benefits). *Id. at 1395w-22.* Under Medicare Part C, approved MA plans must provide members the same benefits and services available to participants living in the area served by Medicare Parts A and B. *42 U.S.C. § 1395w-22(a)(1).* Approved MA plans may supplement Medicare coverage with other benefits. *Id. at § 1395w-22(a)(3).*

Part D of the Medicare program provides prescription drug coverage to qualifying enrollees. [*8] *Id. at 1395w-101.* Under Part D, private prescription drug plans ("PDP") administer the drug benefit programs through contracts with the Secretary of HHS. *42 C.F.R. § 423.272.* Under the standard drug benefit program, a PDP pays for an enrollee's prescription drug costs, after a deductible and 25 percent coinsurance, up to $ 2,250 (the limit in 2006). *Id. at §§ 423.104(d)(1)-(3),(d)(3)(I).* After reaching the limit of $ 2,250, the enrollee is responsible for 100 percent of all drug costs reach the annual out-of-pocket threshold of $ 3,600 (the limit for 2006). *Id.*

**II. *Standard of Review***

When considering a *Rule 12(b)(6)* motion to dismiss, a court must accept the allegations in the complaint as true and construe them in a light most favorable to the plaintiff. *Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir. 1999)* (citation omitted). To satisfy the pleading requirements of *Fed. R. Civ. P. 8,* a complaint must simply give the defendant fair notice of what the plaintiff's claims are and the grounds upon which they rest. *Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512,*

*122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).* Until the recent Supreme Court decision in *Bell Atlantic Corp. v. Twombly, 550 U.S.   , 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007),* courts [*9] routinely followed the rule that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that plaintiff could prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* However, pursuant to *Twombly* which abrogated *Conley,* to survive a motion to dismiss, a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly, 127 S. Ct. at 1964-65.* Thus, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Dismissal of a complaint is warranted if, assuming the truth of the factual allegations of the plaintiff's complaint, there is a dispositive legal issue which precludes relief. *Neitzke v. Williams, 490 U.S. 319, 326, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989).*

**III. *Discussion***

Defendants contend that Plaintiff's state law claims are expressly preempted by federal regulation governing Medicare benefits and Plaintiff has failed to exhaust the administrative appeals required by the Medicare statute for benefit claims. [*10] The threshold issue before the Court is whether *section 1395w-26(b)(3)* of the Medicare Modernization Act ("MMA") expressly preempts Plaintiff's state law claims.

A. *MMA Preemption Provision*

Defendants argue that with the passage of the MMA in 2003, Congress expanded the preemption of state law by declaring that state standards concerning benefits and other activities governed by Medicare standards are presumptively preempted. (Dkt. 43 at 13) The Medicare preemption clause provides that:

> The standards established under this part shall supersede any state law or regulation (other than State licensing law or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

*42 U.S.C. § 1395w-26(b)(3)(2003).* Defendants argue that

Plaintiff's claims are a "state law or regulation . . . with respect to MA plans" and that the plain language of the statute preempts any contract, common law or statutory claims brought by Plaintiff, with the exception of state law regarding licensing and plan solvency. (Dkt. 43 at 14)

Plaintiff contends that the amended complaint does not challenge "any state law or regulation . . . with respect to MA plans" because [*11] she relies on no state standard for MA plans in her complaint. Further, Plaintiff asserts that there are no federal standards regarding proper classification of drugs under Medicare Part D, and therefore, her state claims are not preempted.

In considering questions of federal preemption of state law, a court must be mindful that any understanding of the scope of a preemption statute rests primarily on a fair understanding of congressional purpose. *Medtronic, Inc., v Lohr, 518 U.S. 470, 485-86, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996); Cipollone v. Liggett Group, Inc., 505 U.S. 504, 515, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992).* To discern the scope of a preemption provision, a court may look to the text, legislative history and purpose of the statute as a whole. *Medtronic, Inc., 518 U.S. at 485-86.*

An examination of the purpose of the provision as well as its legislative and regulatory history is instructive. The conference report discussed the Part D preemption provision as follows:

Section 232. Avoiding duplicative State regulation

Present Law

Medicare law currently preempts state law or regulation from applying to M+C plans to the extent they are inconsistent with federal requirements imposed on M+C plans, and specifically, relating to benefit requirements, [*12] the inclusion or treatment of providers, and coverage determinations (including related appeals and grievance processes). The standards established under Part D supersede state laws and regulations in the same manner those standards were superseded for Medicare Advantage plans. Standards specifically superseded include those

relating to benefits (including requirements relating to cost-sharing and the structure of formularies), premiums, requirements relating to inclusion or treatment of providers, coverage determinations (including related grievance and appeals processes), and requirements relating to marketing materials and summaries and schedules of benefits for a plan.

H. Rep. 108-391 at 556 (Nov. 21, 2003).

Accordingly, the conference report underscores that the intent of Congress in enacting the Part D preemption provision was to avoid duplicative and inconsistent state regulations. The preemption rules under Medicare Part C (the Medicare Advantage program and the earlier M+C program) are a guide to determining whether state laws or regulations are preempted under the Medicare Part D prescription drug coverage program. [2]

> 2   The Secretary clarified that Congress intended that the [*13] preemption rules should be applied consistently in *Medicare Parts C and D. 70 Fed. Reg. 46,866, 46,903 (Jan. 28, 2005).*

In 2000, the Secretary concluded that after federal regulations for the M+C program were promulgated, the federal regulations dominated the field and left no room for state standard setting. *65 Fed. Reg. 40,170, 40,259 (June 29, 2000).* The Secretary agreed with a federal ruling which held that a state could not require supplemental providers to offer additional benefits under the M+C program. *Id.* (citing *Massachusetts Ass'n of HMOs v. Ruthardt, 194 F.3d 176, 183 (1st Cir. 1999).* Pursuant to the Secretary's interpretation, once the federal regulations mandated what benefits are covered under the Medicare program, the state law and regulations requiring additional benefits are superseded if they are inconsistent with federal regulations. *65 Fed. Reg. at 40,259.* Indeed, the Secretary stated that, even if the additional state mandated benefits are not federally funded, conflicting state laws or regulations are preempted by the federal regulations. *Id.*

In 1998, the Secretary explained that the same claim or circumstances that gives rise to a Medicare appeal may have elements [*14] that are subject to state claims that

are not preempted. *63 Fed. Reg. 34968, 35013 (June 26, 1998).* The Secretary's interpretation of the preemption clause for the M+C program provided in relevant part:

> [T]he specific preemption [added by the BBA] does not preempt State remedies for issues other than coverage under the Medicare contract (i.e. tort claims or contract claims under State law are not preempted). The same claim or circumstance that gave rise to a Medicare appeal may have elements that are subject to State remedies that are not superseded. For example, an M+C organization's denial of care that a beneficiary believes to be covered care is subject to the Medicare appeals process, but under our interpretation of the scope of the specific preemption on coverage decisions, the matter may also be the subject of a tort case under State law if medical malpractice is alleged, or of a state contract law claim if an enrollee alleges that the M+C organization has obligated itself to provide a particular service under State law without regard to whether it is covered under its M+C contract.

*Id.* Accordingly, even assuming that a beneficiary's claim involves a coverage determination, including [*15] the grievance and appeal process, the claim may give rise to a tort or contact case under state law. In such a situation, a state claim is not superseded.

In support of their position, Defendants focus on the Secretary's comments that Congress specifically expanded the preemption clause when it passed the MAA in 2003. (Dkt. 43 at 12-14) Prior to the passage of the MMA in 2003, there was a presumption that a state law was not preempted if it did not conflict with a Medicare requirement. *70 Fed. Reg. 4194, 4319 (January 28, 2005).* By enacting the MAA in 2003, Congress reversed the old presumption that a state law was not preempted if it did not conflict with a Medicare managed care requirement. *Id.*

Defendants' argument ignores the Secretary's narrow interpretation of the preemption clause. One large insurer objected to the Secretary's narrow interpretation of the statutory preemption authority and requested that the agency make it clear that all state laws and regulations (with the exception of licensing and solvency laws) are preempted with respect to MA and Part D plans. *70 Fed. Reg. at 4319.* The Secretary replied that neither the principles of federalism nor the statute justified such [*16] a broad preemption interpretation. *Id. at 4320.* The Secretary emphasized that the preemption rule "operates only when CMS actually creates standards in the area regulated. To the extent we do not create any standards whatsoever in a particular area, we do not believe preemption would be warranted." *Id.* Under the Secretary's interpretation of the preemption clause as it related to grievances and appeals, "an enrollee will still have state remedies available in cases in which the legal issue before the court is independent of an issue related to the MA's status as a stand alone PDP or an MA-PD plan." *Id. at 4362.*

Similarly, the Secretary rejected a broad interpretation of the preemption provision as it relates to state consumer protection laws and agreed that "consumer protection laws should be left to States." *65 Fed. Reg. 40,170, 40,258 (June 29, 2000).* The Secretary stated that state consumer protection standards were not subject to preemption as long as the state law did not conflict with a M+C program requirement. *Id.*

In support of their position, Defendants rely on *Uhm v. Humana, Inc.,* No. C06-01850RSM, *2006 U.S. Dist. LEXIS 41185 (W.D. Wash. June 5, 2006).* [3] (Dkt. 43 at 10, 14). [*17] Based upon the purpose and legislative history of the Part D preemption provision as well as the subsequent regulatory history, the court disagrees with the overly broad interpretation of the scope of the provision articulated in *Uhm.* [4] Under Defendants' sweeping view of the statute, Congress precluded state courts from affording plaintiffs any protection from harm caused by MA plans. It would take language much plainer than the text of *§ 1395w-26(b)(3)* to convince the court that Congress intended to grant MA plans such a broad immunity from state claims.

> 3   In *Uhm,* plaintiffs alleged claims of breach of contract, violation of state consumer protection statutes, unjust enrichment and fraud in the inducement against Humana for the company's failure to provide plaintiffs with order forms and instructions on how to obtain prescription drugs. *Uhm, 2006 U.S. Dist. LEXIS 41185, at * 4.* As a result of Humana's failure to provide forms and

Case 3:08-cv-00392-H-BLM    Document 15-2    Filed 04/14/2008    Page 29 of 46

Page 6
2007 U.S. Dist. LEXIS 63556, *17

instructions, plaintiffs were forced to purchase their prescription drugs out-of-pocket at retail prices. *2006 U.S. Dist. LEXIS 41185, at * 4.* The court held that plaintiffs' claims fell within the ambit of the "coverage determination" appeal procedures and the grievance procedures [*18] as outlined in the federal regulations. *2006 U.S. Dist. LEXIS 41185, at *8-9.* As such, the court concluded that the Medicare Part D regulations superseded plaintiffs' state claims. *Id.* The court noted that the purpose and legislative history of the MMA supported defendant's preemption argument because Congress intended the Part D preemption provision to be broad in scope. *2006 U.S. Dist. LEXIS 41185, at * 11-13.*

4    Defendants also cite *First Med. Health Plan, Inc. v. Vega, 406 F. Supp. 2d 150, 154 (D. P.R. 2005).* In *Vega,* the district court held that the Part D preemption provision prevented the agency from enforcing a territorial law to bar plaintiff from joining the territorial prescription drug program. *Id. at 154.* However, the *Vega* decision does not support Defendants' preemption argument because the First Circuit vacated the district court's decision. *First Med. Health Plan, Inc. v. Vega, 479 F.3d 46, 53 (1st Cir. 2007).* The circuit court held that the territorial program in dispute was not a Medicare program, but a Medicaid program and was outside the scope of the Medicare Part D preemption provision. *Id. at 52.* Under Medicaid law, defendant was free to enforce territorial law to exclude plaintiff from participating in the program. [*19] *Id. at 53.*

Here, Plaintiff is not relying on any state law or regulation relating to MA plans. Rather, Plaintiff is asserting state common law or statutory claims. Under these circumstances, there is no preemption under the MMA. If Plaintiff relied on a Florida law or regulation requiring MA plans to provide 100 percent reimbursement of all prescription drug benefits, such a regulation would collide with Medicare laws. No such state law or regulation relating to MA plans is at issue in this case. Therefore, the MMA preemption provision does not apply to Plaintiff's state claims.

In sum, Defendants' interpretation of *section 1395w-26(b)(3)* is overbroad. Because Plaintiff's claims are not expressly preempted, the next issue is whether the doctrine of exhaustion of administrative remedies is

applicable to Plaintiff's claims.

B. *Exhaustion of Administrative Remedies: The Ringer Inquiry*

Alternatively, Defendants contend that Plaintiff has failed to exhaust administrative remedies. Deciding whether an individual is entitled to benefits and the amount of benefits are issues entrusted to the Secretary in accordance with established regulations. *42 U.S.C. § 1395ff (a).* Judicial review of a claim [*20] for benefits is available only after the Secretary has rendered a final decision on the claim and only in the manner provided for claims under the Social Security Act (the "Act"). *Heckler v. Ringer, 466 U.S. 602, 605, 104 S. Ct. 2013, 80 L. Ed. 2d 622 (1984);* [5] *42 U.S.C. §§ 405(g), (h), 1395ff(b)(1).* The relevant provisions of the Act, read together, provide that a final decision by the Secretary on a claim "arising under" Medicare may not be reviewed by any person, agency or tribunal except in an action brought in federal district court after exhausting administrative remedies as described above. *42 U.S.C. §§ 405(g) and (h), 1395ii; see 42 U.S.C. §§ 1395ff(b)(1), 1395mm(c)(5)(B).*

5    The plaintiffs in *Ringer* challenged the Secretary's policy not to pay for a special type of surgery to relieve respiratory distress. *Id. at 604-07.* One commentator has suggested that *Ringer* did not adopt the "inextricably intertwined" test for determining whether a claim arises under Medicare. *See* Stephen M. Elwell, *Preemption of Contract Claims by the Medicare Act: An Analysis of the Recent Holding in Lifecare Hospitals v. Ochsner Health Plan, 24 Rev. Litig. 125, 143 (2005).* However, the Eleventh Circuit has recognized this test in applying [*21] *Ringer. American Academy of Dermatology v. HHS, 118 F.3d 1495, 1499 (11th Cir. 1997); see also RenCare, LTD v. Humana Health Plan of Texas, Inc., 395 F. 3d 555, 559 (5th Cir. 2004); Kaiser v. Blue Cross of California, 347 F.3d 1107, 1112-13 (9th Cir. 2003); Midland Psychiatric Assocs., Inc. v. United States, 145 F.3d 1000, 1004 (8th Cir. 1998); Manakee Professional Medical Transfer Serv., Inc. v. Shalala, 71 F.3d 574, 579 (6th Cir. 1995).*

*Ringer* referred to two tests in concluding that the plaintiffs' claims arose under the Medicare Act: (1) both the standing and the substantive basis for the presentation of the claims was the Medicare Act; or (2) the claims

were "inextricably intertwined" with a claim for Medicare benefits. *Ringer, 466 U.S. at 614-15.* [6] The Court recognized, however, that a claim that is "wholly collateral" to a claim for benefits under the Act is not subject to the administrative process; the Court also suggested exhaustion would be excused if a claimant made a colorable showing that an erroneous denial of benefits would injure him or her in a way that could not be remedied by the later payment of benefits. *Id. at 618.*

> [6] Some courts have conflated the preemption doctrine [*22] and the exhaustion of administrative remedies requirement under the Medicare Act. *See e.g. Kennedy v. Health Options, Inc., 329 F. Supp. 2d 1314, 1316-18 (S.D. Fla. 2004).* However, they are distinct doctrines. *See Uhm, 2006 U.S. Dist. LEXIS 41185, at *6 n 2.*

Post-*Ringer*, the Eleventh Circuit has held that the broad construction of the "arising under" language of *subsection 405(h)* prevents "beneficiaries from circumventing the administrative process by creatively styling their benefits claims as collateral constitutional or statutory challenges not 'arising under' Medicare." *United States v. Blue Cross & Blue Shield, 156 F.3d 1098, 1104 (11th Cir. 1998).* Moreover, the jurisdictional limitations contained in the Medicare Act demonstrate that *subsection 405(h)* simply seeks "to preserve the integrity of the administrative process Congress designed to deal with challenges to amounts determination by dissatisfied beneficiaries, not to serve as a complete preclusion of all claims related to benefit determinations in general." *Id. at 1109.* In scrutinizing a plaintiff's claim, a court should determine whether the plaintiff is simply seeking benefits, a claim cognizable within the administrative [*23] scheme designed by Congress, or whether the plaintiff is bringing a claim for which administrative review is unavailable. *Id.* Accordingly, "the Supreme Court has not sought to extend the reach of *subsection 405(h)* to bar claims that, although they may implicate benefit determinations, are certainly not veiled claims for benefits by a disgruntled beneficiary that could have, and should have, been pursued administratively in the first instance." *Id.*

### C. Whether Plaintiff's Claims Arise Under the Medicare Act

Applying *Ringer* to the present case, Plaintiff's claims are based upon state common law and state

statutory causes of action. The standing and substantive basis for her claims are not the Medicare Act. Thus, Plaintiff must exhaust her administrative remedies and appeal the resulting decision in federal court only if Plaintiff's claims are inextricably intertwined with a claim for benefits.

### 1. Plaintiff's Contract Claims Against Humana

In Count I, Plaintiff alleges that Humana breached the Medicare Advantage contract with Plaintiff when it improperly classified the chemotherapy drugs as covered by Medicare Part D. (Dkt. 35 at 10) Count II of the amended complaint asserts that Plaintiff [*24] is a third party beneficiary of the Medicare Advantage contract between Humana and the federal government. (Dkt. 35 at 11) When Humana incorrectly categorized her cancer treatment drugs under Medicare Part D, Plaintiff alleges that Humana breached the contract.

Plaintiff seeks an order enjoining Defendants from improperly charging Medicare Part D for prescription drug charges that should be properly charged to Medicare Part B. In addition, Plaintiff requests an order requiring Defendants to pay as damages the out-of-pocket medical charges that Plaintiff was required to pay because of Humana's alleged improper classification. (Dkt. 35 at 10-11, 14)

Counts I and II are essentially claims for reimbursement of benefits amounts under the Medicare Act. Furthermore, the injunctive relief sought by Plaintiff is indistinguishable from the request for reimbursement of payments for the chemotherapy drugs. *See Am. Acad. of Dermatology, 118 F.3d at 1499* (plaintiff's claim for injunctive relief to refrain agency from implementing policy against reimbursement for medical procedure was inextricably intertwined with claim for benefits). Accordingly, because Plaintiff's contract claims are inextricably [*25] intertwined with a claim of benefits under the Medicare Act, the requirements of presentment and exhaustion must be met prior to the exercise of judicial review.

### 2. Plaintiff's Breach of Fiduciary Duty Claim Against Humana

Count III states a breach of fiduciary duty claim against Humana. (Dkt. 35 at 12) Plaintiff alleges that Humana had a fiduciary duty to administer the Medicare Advantage program honestly and accurately. (*Id.*) By

incorrectly classifying chemotherapy drugs under Part D program, Plaintiff asserts that Humana breached its fiduciary duty to her. Plaintiff contends that Humana was enriched by its decision to categorize the chemotherapy drugs under Part D because of the different reimbursement rates under Parts B and D. Plaintiff seeks out-of-pocket medical expenses paid for her chemotherapy drugs and disgorgement of all profits Humana enjoyed as a result of the misclassification of the chemotherapy drugs. (Dkt. 35 at 14)

A breach of a fiduciary duty is a tort and the beneficiary can obtain redress either at law or in equity for the harm done. *King Mt. Condo. Ass'n v. Gundlach, 425 So. 2d 569, 571 (Fla. 4th Dist. Ct. App. 1983).* Alternatively, the beneficiary of the fiduciary [*26] duty is entitled to obtain the benefits derived by the fiduciary through the breach of duty. *Id.* A breach of fiduciary duty will support an award of punitive damages. *Laney v. Equity Life Insur. Co., 243 F. Supp. 2d 1347, 1354 (M.D. Fla. 2003).* An insured's claim for disgorgement of profits stemming from an insurance company's breach of fiduciary duty is viewed as a request for punitive damages. *Carnegie v. Mut. Sav. Life Ins. Co., No. CV-99-S-3292-NE, 2002 U.S. Dist. LEXIS 21396, at *45-56 (N.D. Ala. Nov. 1, 2002).*

Thus, Plaintiff's claim for breach of fiduciary duty is not inextricably intertwined with her claim for reimbursement of benefits. Other courts have held that a beneficiary's claim for breach of fiduciary duty against a Medicare insurer is not a claim arising under the Medicare Act. *See e.g., Hofler v. Aetna US Healthcare of Cal., Inc., 269 F.3d 764, 770 (9th Cir. 2002), overruled in part on other grounds, Martin v. Franklin Capital Corp., 546 U.S. 132, 126 S. Ct. 704, 163 L. Ed. 2d 547 (2005)*(Congress did not intend to abolish all state remedies which might exist against a private Medicare provider for torts committed during its administration of Medicare benefits); *Kennedy, 329 F. Supp. 2d at 1317* (claim of breach of fiduciary duty did [*27] not arise under Medicare Act); *see also Ardary v. Aetna Health Plans of California, Inc., 98 F.3d 496, 501 (9th Cir. 1996)*(without evidence of Congressional intent to preclude state claims, the "arising under" language should not be interpreted to mean that Medicare providers cannot be held responsible for tortious acts committed in the context of the denial of Medicare benefits).

*3. Plaintiff's Statutory Consumer Protection Claim*

*Against Humana*

In Count V, Plaintiff asserts that Defendant Humana violated the Kentucky's Consumer Protection Act ("KCPA") by improperly classifying chemotherapy drugs under Medicare Part D.

The KCPA provides that unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are unlawful. *Ky. Rev. Stat. § 367.170.* If a plaintiff prevails on a KCPA claim and proves defendant's actions are malicious, oppressive or fraudulent, plaintiff may be eligible to recover punitive damages. *Hollon v. Consumer Prot. Recovery Ctr., 417 F. Supp. 2d 849, 852 (E.D. Ky. 2006).* The KCPA authorizes the award of attorneys fees and costs. *Ky Rev. Stat. § 367.220(3).* Assuming the Kentucky consumer protection statute applies to Plaintiff's claim, [*28] Plaintiff may be eligible to recover punitive damages, attorneys' fees and costs. As such, this claim is not a claim for reimbursement of medical benefits and is not inextricably intertwined with the Medicare Act. *See e.g., Hofler, 296 F.3d at 768* (not clear and manifest intent by Congress to preempt entire field of state regulations regarding Medicare plans); *Commonwealth of Pennsylvania v. Tap Pharm. Prods., 415 F. Supp. 2d 516, 525 n.6 (E.D. Pa. 2005)*(Medicare Act does not preempt state's ability to regulate fraudulent billing practices under state consumer protection laws); *In re Pharm. Indus. Average Wholesale Price Litig., 263 F. Supp. 2d 172, 188 (D. Mass. 2003)*(same). Thus, Count IV is not inextricably intertwined with Plaintiff's claim for reimbursement of Medicare benefits.

*D. Exhaustion of Administrative Remedies*

Having concluded that Plaintiff's two contract claims are subject to the administrative exhaustion requirement, the next issue is whether Plaintiff has complied.

The Medicare statute demands the channeling of claims for benefits through the administrative process. *Lifestar Ambulance Serv. v. United States, 365 F.3d 1293, 1296 (11th Cir. 2004), cert. denied, 543 U.S. 1050, 125 S. Ct. 866, 160 L. Ed. 2d 770 (2005)*(quoting [*29] *Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 13, 120 S. Ct. 1084, 146 L. Ed. 2d 1 (2000).* Exhaustion of Medicare claims contains two components. First, there is a nonwaivable requirement that a claim for benefits be presented to the agency. *Ringer, 466 U.S. at 617; Mathews v. Eldridge, 424 U.S. 319, 328-29, 96 S.*

*Ct. 893, 47 L. Ed. 2d 18 (1976)*(initial claim presentment is an essential and distinct prerequisite for jurisdiction and cannot be waived by the Secretary). Second, a claimant must fully pursue the prescribed administrative remedies prescribed by the Medicare system, although this requirement may be waived. *Ringer, 466 U.S. at 617.* The MMA contains procedures for both presenting claims to the sponsor of the Medicare Part D drug plan and pursuing those claims through the administrative process. *42 U.S.C. §§ 1395w-104(g)-(h).*

Plaintiff contends she complied with the presentment and exhaustion requirements when she made numerous calls to Humana's help line. [7] (Dkt. 35 at 67 Cal. 474, 8 P 31) Specifically, Plaintiff alleges that she attempted to avail herself of the available administrative remedies by making "perhaps as many as a dozen" telephone calls to Humana's help line, but "[h]er experience was uniformly frustrating: she received [*30] inconsistent answers when she received any response at all." (*Id.*) Plaintiff also alleges that seeking any administrative relief would have been futile. (Dkt. 35 at 8 P 32)

> [7] Although there is no jurisdictional requirement that a plaintiff plead exhaustion of administrative remedies, *see Jones v. Bock,    U.S.    , 127 S. Ct. 910, 919, 166 L. Ed. 2d 798 (2007)*(failure to exhaust is an affirmative defense), this issue is appropriately raised in the instant motions.

Plaintiff's failure to establish that she presented any concrete appeals and pursued those appeals with Humana prevents this court from exercising jurisdiction over her contract claims at this time. Plaintiff's futility argument is insufficient to skirt the mandate of exhaustion because the presentment argument may not be waived. To avail herself of the futility doctrine for purposes of excusing further compliance with the administrative process, Plaintiff must show that the issues raised are "wholly collateral" and any alleged injury could not be remedied by the retroactive payment of benefits after exhaustion of administrative remedies. *Ringer, 466 U.S. at 618.* As discussed above, because Plaintiff's contract claims are inextricably intertwined [*31] with a claim for Medicare benefits; these claims are not independent or wholly collateral. Thus, Plaintiff is not excused from complying with the administrative appeal process as it relates to her contract claims. [8]

> [8] Plaintiff also urges the application of an exception to the exhaustion requirement because

her claims present purely legal issues involving contract interpretation (Dkt. 44 at 20, n. 76). Of the cases Plaintiff cites to support this argument, only one, *Illinois Council, 529 U.S. at 12-13,* is binding on this court. There, the Supreme Court observed that although courts have carved out exceptions to the doctrines of "ripeness" and "exhaustion" in certain circumstances inapplicable here, *§ 405(h)* prevents the application of these exceptions in the Medicare context and "demands the 'channeling' of virtually all legal attacks through the agency." *Id. at 13.* Plaintiff's argument is unpersuasive.

## E. *Plaintiff's Claim Against Caremark*

In Count V, Plaintiff alleges that Caremark provided pharmacy benefit management services to Humana. (Dkt. 35 at 14, P 71) Plaintiff further alleges that Caremark breached its contract with Humana by classifying the chemotherapy drugs under Medicare [*32] Part D. (Dkt. 35 at 14, PP 72-73) Plaintiff asserts a third party beneficiary breach of contract claim against Caremark. (Dkt. 35 at 14, P 70)

Apart from the preemption and exhaustion arguments previously addressed, Caremark contends that Plaintiff's claim should be dismissed because neither Caremark or one of Caremark's subsidiaries had a contract with Humana at the time Plaintiff was receiving her chemotherapy treatment. (Dkt. 57 at 8) The parties agree that PCS Health Systems, Inc. ("PCS"), a subsidiary of Caremark, provided pharmacy benefit management services to Humana in connection with Humana's drug prescription program. (Dkt. 84 at 1) Also, the parties stipulate that Humana terminated its agreement with PCS on September 14, 2005 and Caremark ceased providing pharmacy benefit management services to Humana as of that date. (Dkt. 84 at 2) During the relevant time period, Caremark admits that a subsidiary of Caremark agreed to provide "specialty" services to Humana, but did not obligate Caremark to provide pharmacy benefit management services. (Dkt. 57 at 3, n.3)

In response, Plaintiff argues that her claim is based on "the existence of some form of contractual relationship between [*33] Caremark and Humana." (Dkt. 60 at 2) Plaintiff asserts that Caremark was one of Humana's subcontractors during 2006, even if it was not Humana's pharmaceutical benefits manager. (*Id.*)

If there is no contract on which to base a third party beneficiary claim, plaintiff's claim must be dismissed. *Terry v. Northrup Worldwide Aircraft Serv., Inc., 786 F.2d 1558, 1561 (11th Cir. 1986)*. To survive a motion to dismiss, Plaintiff's complaint must include enough facts to state a claim to relief that is plausible on its face. *Twombly, 127 S. Ct. at 1964-1965*. Plaintiff's bare assertion that some form of contractual relationship existed between Caremark and Humana does not satisfy her obligation to provide sufficient grounds for relief. Accordingly, the court recommends that Caremark's motion to dismiss be granted with leave to amend within twenty (20) days after the court's dismissal of Count V of the amended complaint.

## CONCLUSION

Defendants have not shown that Plaintiff's state law claims are expressly preempted by the Medicare Act. However, Plaintiff's contract claims arise under the Medicare Act because these claims are inextricably intertwined with a claim for Medicare benefits. Plaintiff is [*34] required to exhaust her administrative remedies before seeking judicial review of her contact claims. Therefore, Counts I and II of Plaintiff's amended complaint should be dismissed.

Plaintiff's tort and consumer protection claims do not arise under the Medicare Act and Plaintiff is not required to exhaust the administrative remedies under the Medicare Act before seeking judicial review of these

claims. Defendant Humana's motion to dismiss should be denied as to Counts III and IV.

Because Plaintiff failed to demonstrate that a contract for pharmacy benefit management services existed between Caremark and Humana during the relevant time period, dismissal of Count V of the amended complaint is appropriate with leave to refile.

It is therefore **RECOMMENDED** that:

(1) **Defendant Humana, Inc.'s Motion to Dismiss** (Dkt. 43) be **GRANTED** as to Counts I and II in part and **DENIED** as to Counts III and IV;

(2) **Defendant Caremark Rx, Inc.'s Motion to Dismiss** (Dkt. 57) be **GRANTED;** however, the court recommends that Plaintiff be permitted to file an amended complaint within twenty (20) days after the court's dismissal of Count V of the amended complaint.

**ELIZABETH A. JENKINS**

**United States Magistrate Judge**

Dated: [*35] August 16, 2007

# EXHIBIT "5"

1 of 2 DOCUMENTS

**DARYL L. MASEY, individually and on behalf of all others similarly situated, Plaintiff, v. HUMANA, INC. and CAREMARK RX, INC., Defendants.**

**Case No. 8:06-cv-1713-T-24-EAJ**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION**

*2007 U.S. Dist. LEXIS 70464*

**September 24, 2007, Decided**
**September 24, 2007, Filed**

**PRIOR HISTORY:** *Masey v. Humana, Inc., 2007 U.S. Dist. LEXIS 63556 (M.D. Fla., Aug. 16, 2007)*

**COUNSEL:** [*1] Daryl L. Masey, individually and on behalf of all others similarly situated, Plaintiff: Christa L. Collins, J. Andrew Meyer, LEAD ATTORNEYS, James, Hoyer, Newcomer & Smiljanich, PA, Tampa, FL; Jordan M. Lewis, Wood R. Foster, Jr., LEAD ATTORNEYS, Siegel, Brill, Greupner, Duffy & Foster, P.A., Minneapolis, MN.

For Humana, Inc., Defendant: Brian D. Boyle, Stephen D. Brody, LEAD ATTORNEYS, O'Melveny & Myers LLP, Washington, DC; Edward Martin Waller, Jr., LEAD ATTORNEY, Fowler, White, Boggs & Banker, PA, Tampa, FL.

For Caremark RX, Inc., Defendant: Martin J. Bishop, Robert H. Griffith, LEAD ATTORNEYS, Foley & Lardner LLP, Chicago, IL; Thomas F. Munro, LEAD ATTORNEY, Adam R. Alaee, Foley & Lardner, LLP, Tampa, FL.

**JUDGES:** SUSAN C. BUCKLEW, United States District Judge.

**OPINION BY:** SUSAN C. BUCKLEW

**OPINION**

**ORDER**

This cause comes before the Court for consideration of Defendant Humana, Inc.'s Motion to Dismiss (Doc. No. 43), Plaintiff's Response in Opposition to Defendant's Motion to Dismiss (Doc. No. 44), Defendant Caremark Rx, Inc.'s Motion to Dismiss (Doc. No. 57), and Plaintiff's Response in Opposition to Defendant's Motion to Dismiss (Doc. No. 60). These motions were considered by the United States Magistrate Judge pursuant [*2] to an order of referral. (Doc. No. 73.) Magistrate Judge Jenkins heard oral argument on the motions on July 17, 2007. (Doc. No. 83.)

Thereafter, Magistrate Judge Jenkins filed her Report and Recommendation, recommending that Defendant Humana, Inc.'s Motion to Dismiss be granted as to Counts I and II of Plaintiff's Amended Complaint, and denied as to Counts III and IV. (Doc. No. 85.) She further recommended that Defendant Caremark Rx, Inc.'s Motion to Dismiss be granted as to Count V, but that Plaintiff be permitted to file an amended complaint within 20 days after the Court's dismissal of Count V. All parties were furnished copies of the Report and Recommendation on August 16, 2007, and were afforded the opportunity to file objections pursuant to *28 U.S.C. § 636(b)(1)*. Defendants Humana, Inc. and Caremark Rx, Inc. filed Partial Objections to the Magistrate's Report on August 30, 2007. (Doc. Nos. 86, 87.) Plaintiff Masey filed a Memorandum in Opposition to Defendants' Objections to the Report and Recommendation on September 17, 2007. [1] (Doc. No. 88).

> 1    Notably, Plaintiff does not oppose the dismissal of Counts I and II of her amended complaint, and argues that the Court should adopt

the [*3] Report and Recommendation in full.

Upon consideration of the Report and Recommendation, Defendants' Partial Objections, and Plaintiff's Memorandum in Opposition to the Objections, and upon this Court's independent examination of the file, it is determined that the Report and Recommendation should be adopted except to the extent that Magistrate Judge Jenkins recommended that the motions to dismiss be denied as to Counts III and IV, and granted with leave to amend as to Count V. [2] As explained below, the Court concludes that these claims are "inextricably intertwined" with a claim for Medicare benefits, and therefore, Plaintiff was required to exhaust her administrative remedies before seeking judicial review. Because Plaintiff did not exhaust her administrative remedies, these claims too must be dismissed.

[2] Specifically, the Court declines to adopt Parts C (2), C (3), and E of the Report and Recommendation.

Plaintiff, an enrollee in Defendant Humana, Inc.'s ("Humana") Medicare Advantage health care plan, was treated for breast cancer in 2006 with chemotherapy. Plaintiff alleges that her chemotherapy drugs should have been covered under Medicare Part B, which covers 100 percent of the costs [*4] of the drugs, but that Humana incorrectly characterized the drugs as covered by Medicare Part D. Because Humana incorrectly designated the drugs, Plaintiff contends that Humana improperly required her to pay for these drugs. Plaintiff further alleges that Humana profited from this miscategorization.

Plaintiff asserts four claims against Humana: (1) breach of contract for "improperly credit[ing] Part B charges to subscribers' Part D coverage;" (2) third party beneficiary breach of contract for "incorrectly credit[ing] Part B charges to [subscribers'] Part D coverage limits;" (3) breach of fiduciary duty for "improperly credit[ing] Part B charges to Part D coverage;" and (4) violations of Kentucky's consumer protection law for "improperly classify[ing] Part B charges as Part D charges." In Count V, Plaintiff alleges that Humana subcontracted out certain prescription drug and benefit management responsibilities to Caremark Rx, Inc. ("Caremark"). Plaintiff asserts a third party beneficiary breach of contract claim against Caremark, alleging that it breached its contract with Humana by "crediting . . . Part B drug charges to subscribers' Part D coverage." [3]

[3] Plaintiff seeks the following [*5] remedies: (1) certification of the class with the named plaintiff as the class representative; (2) "[a]n order enjoining defendants from improperly charging Part D those medicine charges that are properly chargeable to Medicare Part B;" (3) "[a]n order requiring defendants to pay as damages those out-of-pocket medical charges that plaintiff and the class have been required to pay because of defendants' improper classification of Part B medical charges;" (4) "[a]n order requiring disgorgement of all profits that defendants have enjoyed that are attributable to the incorrect classification of medical charges;" (5) reasonable attorneys' fees and costs; and (6) prejudgment interest.

After setting forth the proper legal standards governing the exhaustion requirement for claims "arising under" the Medicare Act, Magistrate Judge Jenkins concluded that Plaintiff's contract claims (Counts I and II) were "inextricably intertwined" with claims for Medicare benefits, and therefore, the requirements of presentment and exhaustion must be met before seeking judicial review of those claims. With regard to Plaintiff's breach of fiduciary duty and statutory consumer protection claims (Counts III and [*6] IV), however, Magistrate Judge Jenkins concluded that the same presentment and exhaustion requirements did not apply. The Magistrate Judge reasoned that, because Plaintiff's breach of fiduciary duty claim could result in an award of punitive damages, and because she is seeking disgorgement of profits as part of her requested remedy, that claim is not "inextricably intertwined" with her claim for reimbursement of benefits under the Medicare Act. Likewise, the Magistrate Judge reasoned that Plaintiff's claim under Kentucky's Consumer Protection Act is not "inextricably intertwined" with a claim for benefits because, if she prevails on such a claim, she is eligible to recover punitive damages, attorneys' fees, and costs. Accordingly, the Magistrate Judge recommended that the motions to dismiss the breach of fiduciary duty and statutory consumer protection claims be denied.

The Court, however, concludes that the cases the Magistrate Judge relied on to make that recommendation support a different conclusion. Each of those cases involved claims that could not be remedied by the payment of Medicare benefits and were thus collateral to the issue of entitlement to Medicare benefits. For

example, [*7] in *Ardary v. Aetna Health Plans of California, 98 F.3d 496, 499 (9th Cir. 1996)*, the Ninth Circuit considered whether the Medicare Act precluded the heirs of a deceased Medicare beneficiary from bringing a wrongful death claim, "when that claim [did] not seek recovery of Medicare benefits but instead [sought] compensatory and punitive damages" for failure to provide emergency medical services. The court ruled that the heirs' tort claims for negligence, emotional distress, and misrepresentation were not "inextricably intertwined" with a claim for Medicare benefits because the claims were "predicated on" the failure to provide emergency medical services, and the heirs *"at bottom* [were] not seeking to recover *benefits." Id. at 500.* Significantly, the injury sustained by the beneficiary--wrongful death--"[could] not be remedied by the retroactive authorization or payment of" the emergency services. *Id.* Therefore, the claims did not "arise under" the Medicare Act and the exclusive administrative procedures outlined for resolution of benefit determinations did not preempt the tort claims. *Id. at 501.*

Likewise in *Hofler v. Aetna, 296 F.3d 764 (9th Cir. 2002)*, the widow of a Medicare beneficiary [*8] filed suit against a health care provider for wrongful death, breach of fiduciary duty, unfair business practices, and other claims. She alleged that the health care provider had improperly withheld medically-necessary services, a decision that resulted in the beneficiary's delayed cancer diagnosis and ultimate death, because those services undercut the health care provider's profits. *Id. at 766-67.* Relying on the *Ardary* decision, the Ninth Circuit again found it significant that the beneficiary's injury would not be remedied by the payment of benefits: "[I]t is too late for the deceased [beneficiary] to get a second opinion about his esophageal cancer, have a biopsy to diagnose his prostate cancer, or receive treatment for his aneurysm." *Id. at 769.* The court again ruled that the tort claims were not "inextricably intertwined" with the denial of benefits. *Id.*

In *Kennedy v. Health Options, Inc., 329 F. Supp. 2d 1314, 1318 (S.D. Fla. 2004)*, the Southern District of Florida relied on *Ardary* and *Hofler* to find that a Medicare beneficiary's breach of contract and breach of fiduciary duty claims were not "inextricably intertwined" with a claim for Medicare benefits. The beneficiary alleged [*9] that she was injured after she fell in her home the same day her health care provider prematurely

discharged her from the hospital. *Id. at 1316-17.* The court found it significant that the beneficiary was "not seeking declaratory or injunctive relief regarding Medicare benefits" or "reimbursement of wrongly denied benefits." *Id. at 1316.* Nor was she alleging "that [the health care provider] must cover a certain procedure either prospectively or retroactively." *Id. at 1317.* Rather, the beneficiary sought damages that resulted from the delay and denial of medical care, and such a claim is collateral to a claim for Medicare benefits. *Id. at 1318.*

Here, however, the breach of fiduciary duty and consumer protection claims are "inextricably intertwined" with what is "in essence" a claim for Medicare benefits. *See Heckler v. Ringer, 466 U.S. 602, 624, 104 S. Ct. 2013, 2026, 80 L. Ed. 2d 622 (1984).* Using almost identical language in each of her five claims, Plaintiff alleges that Humana and Caremark improperly credited Part B charges to the Part D coverage limits, thereby causing her to be personally liable for expenses that should have been completely covered under her Part B coverage. Nowhere [*10] does Plaintiff allege that she suffered an additional injury due to the denial of coverage that cannot be remedied through the payment of Medicare benefits.

The fact that Plaintiff also seeks disgorgement of profits, punitive damages, attorneys' fees, and costs for her tort claims, but not her contract claims, is an artificial distinction designed to "circumvent[] the administrative process by creatively styling [her] benefits claims as collateral [claims] not 'arising under' Medicare." *United States v. Blue Cross & Blue Shield of Ala., Inc., 156 F. 3d 1098, 1104 (11th Cir. 1998); see also Am. Acad. of Dermatology v. Dep't of Health & Human Servs., 118 F. 3d 1495, 1499 (11th Cir. 1997)* (ruling that a claim seeking an order enjoining the Department of Health and Human Services from refusing to reimburse claims "clearly involves claims for benefits under the Medicare Act"). Her entitlement to additional *remedies* for her tort claims does not change the substance of the claims, which is that she had to incur costs that would have been covered by Medicare Part B if Defendants had not improperly classified her benefit claims. The Court fails to recognize the distinction drawn in the Report [*11] and Recommendation between Plaintiff's contract claims in Counts I and II, and her tort and statutory claims in Counts III and IV.

Finally, with regard to Plaintiff's third party

beneficiary breach of contract claim against Defendant Caremark Rx, Inc. (Count V), Magistrate Judge Jenkins recommended that this claim be dismissed with leave to amend. This recommendation was made not based on preemption or exhaustion, but rather, on the basis that Plaintiff had failed to allege a contractual relationship between Caremark and Humana that was sufficient to provide grounds for relief.

The Court declines to adopt that recommendation, and instead concludes that Count V should be dismissed for the same reasons articulated in Part C (1) and D of the Report and Recommendation regarding Plaintiff's contract claims against Humana. Like Plaintiff's contract claims against Humana, Plaintiff's third party beneficiary contract claim against Caremark is essentially a claim for reimbursement of benefits under the Medicare Act, regardless of whatever contractual relationship formed the basis of the contract claim.

Accordingly, it is **ORDERED AND ADJUDGED** that

(1) The Magistrate Judge's Report and Recommendation [*12] (Doc. No. 85) is

adopted in part and incorporated in part by reference in this Order of the Court, as indicated above;

(2) Defendant Humana, Inc.'s Motion to Dismiss Counts I, II, III, and IV of Plaintiff's Amended Complaint (Doc. No. 43) is **GRANTED;**

(3) Defendant Caremark Rx, Inc.'s Motion to Dismiss Count V of Plaintiff's Amended Complaint (Doc. No. 57) is **GRANTED;**

(4) As there are no remaining claims before the Court, the Clerk is directed to close this case.

**DONE AND ORDERED** at Tampa, Florida, this 24th day of September, 2007.

SUSAN C. BUCKLEW

United States District Judge

**EXHIBIT "6"**

1 of 1 DOCUMENT

**SUSIE WILLIAMS, Plaintiff, v. VIVA HEALTH, INC., et al., Defendants.**

**CASE NO. 2:07-cv-321-WKW (WO)**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

*2008 U.S. Dist. LEXIS 5639*

**January 25, 2008, Decided
January 25, 2008, Filed**

**COUNSEL:** [*1] For Susie Williams, Plaintiff: L. Cooper Rutland, Jr., LEAD ATTORNEY, Rutland & Braswell, Union Springs, AL.

For VIVA Health, Inc., Defendant: Amelia T. Driscoll, LEAD ATTORNEY, Bradley, Arant, Rose & White, Birmingham, AL; James Sturgeon Christie, Jr., LEAD ATTORNEY, Bradley Arant Rose & White LLP, Birmingham, AL.

**JUDGES:** W. Keith Watkins, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** W. Keith Watkins

**OPINION**

**MEMORANDUM OPINION AND ORDER**

This case is before the court on the plaintiff's Motion to Remand (Doc. # 4). For the reasons set forth below, the Motion to Remand is due to be GRANTED.

**I. FACTS AND PROCEDURAL HISTORY**

Plaintiff Susie Williams ("Williams") sued Viva Health, Inc. ("Viva") and Ricky Crapp ("Crapp") alleging tort and breach of contract claims under state law that related to the insurance that Viva provided and Crapp sold to her. Williams has succinctly summarized her claims: "Plaintiff sued VIVA because they [sic] negligently screwed up her insurance." (Pl.'s Remand Br. 10.)

In her complaint, Williams states that in October 2006 she received a solicitation from Viva through the mail to enroll in its prescription drug program. (Compl. P 7.) Williams contacted Viva and met with a Viva sales representative, [*2] who told her that Viva's program was superior to her current prescription drug program. (*Id.* PP 8-11.) Williams then claims she enrolled in Viva to supplement -- not replace -- her Public Education Employee Health Insurance Plan ("PEEHIP") prescription coverage that she currently had. (Williams Aff.) However, shortly after enrolling with Viva, Williams learned from her pharmacist that her total prescription drug coverage, including her PEEHIP plan, was $ 3,000.00 per year. (Compl. P 13.) Because her prescriptions cost in excess of $ 8,000.00 per year, Williams filed a disenrollment form with Viva in December 2006. (*Id.* PP 14-15.) Viva did not disenroll her from the program, and Williams claims she has experienced great stress because of Viva's failure to disenroll her and because she has not known how she will pay for her prescriptions. (*Id.* PP 16-18.)

On March 13, 2007, Williams filed a complaint in the Circuit Court of Bullock County. [1] On April 12, 2007, Viva removed the case on federal question grounds, and Williams filed a motion to remand on April 25, 2007. The motion is fully briefed and ripe for review.

1    Crapp has not yet been served with the complaint.

**II. STANDARD OF REVIEW**

Federal [*3] courts have a strict duty to exercise the jurisdiction conferred on them by Congress.

*Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716, 116 S. Ct. 1712, 135 L. Ed. 2d 1 (1996).* However, "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. Of Am., 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994).* Thus, with respect to cases removed to this court pursuant to *28 U.S.C. § 1441*, the law of the Eleventh Circuit favors remand where federal jurisdiction is not absolutely clear. "[R]emoval statutes are construed narrowly; where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand." *Burns v. Windsor Ins. Co., 31 F.3d 1092, 1095 (11th Cir. 1994).*

## III. DISCUSSION

Viva contends that removal was proper because there is federal question jurisdiction. A federal court may exercise subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." *28 U.S.C. § 1331.* A defendant may remove to the federal courts "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." *Id. § 1441(a).* A case arises under federal law "if 'a well-pleaded complaint establishes either [*4] that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" *Empire HealthChoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 126 S. Ct. 2121, 2131, 165 L. Ed. 2d 131 (2006)* (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 27-28, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983)).* Viva argues that this case arises under federal law because Williams's claims are preempted by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified in scattered sections of 42 U.S.C.), or, in the alternative, because they depend on embedded and disputed issues of federal law.

### A. Preemption

Viva removed this case claiming that because it has a preemption defense there is federal question jurisdiction. Specifically, Viva claims that *42 U.S.C. § 1395w-26(b)(3)* and *42 U.S.C. § 405(h)* preempt Williams's claims. The court finds that there is no federal question jurisdiction because neither statute completely preempts Williams's claims.

Though a claim arises under federal law if it

conforms to the well-pleaded complaint rule, *see McVeigh, 126 S. Ct. at 2131;* [*5] *Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987),* the existence of a federal question defense is not sufficient to create federal question jurisdiction unless complete preemption exists. *Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 6-8, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003).* However, in order for complete preemption to exist, "the pre-emptive force of a statute [must be] so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar, 482 U.S. at 393* (quoting *Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 65, 107 S. Ct. 1542, 95 L. Ed. 2d 55 (1987)).*

### 1. Preemption under *42 U.S.C. § 1395w-26(b)(3)*

Viva argues that there is federal question jurisdiction because *§ 1395w-26(b)(3)* preempts Williams's claims arising under state law. *Section 1395w-26(b)(3)* provides that "[t]he standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws related to plan solvency) with respect to [Medicare Advantage] plans which are offered by [Medicare Advantage] organizations under this part." *42 U.S.C. § 1395w-26(b)(3).*

Viva first asserts that there is federal question jurisdiction because it has federal [*6] preemption defenses to Viva's claims that arise under state law. [2] Viva specifically alleges that there is express [3] and conflict [4] preemption. Express and conflict preemption are types of ordinary preemption; ordinary preemption "provid[es] a substantive defense to a state law action on the basis of federal law." *Dunlap v. G&L Holding Group, Inc., 381 F.3d 1285, 1290 n.8 (11th Cir. 2004)* (internal quotations marks and citation omitted).

> 2  Viva alleges that Williams's claims in count one, that Viva negligently procured her insurance, and in count three, that Viva acted wantonly, are expressly preempted by *42 C.F.R. § 422.56*, which Viva contends prohibited it from persuading Williams not to enroll in its plans. Viva also argues that Williams's claims are preempted through conflict preemption by *42 C.F.R. § 423.50* because its marketing materials met federal standards. Viva does not identify which of Williams's claims are specifically preempted by *§ 423.50* and merely asserts "to the

extent that Plaintiff's claims rely on the adequacy of Viva Health's marketing materials, Plaintiff's claims are preempted." (Def.'s Resp. Br. to Remand 19.) The court does not rule on or evaluate whether these [*7] regulations preempt Williams's claims because ordinary preemption does not give rise to federal question jurisdiction.

3    "'Express preemption' occurs when Congress has manifested its intent to preempt state law explicitly in the language of the statute." *Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1122 (11th Cir. 2004).*

4    Conflict preemption "arises in two circumstances in that it is impossible to comply with both federal and state law and when state law stands as an obstacle to achieving the objectives of the federal law." *Cliff, 363 F.3d at 1122.*

Viva argues that ordinary preemption is sufficient to create a federal question, but this position has no basis in law because only complete preemption gives rise to federal question jurisdiction. As the Eleventh Circuit has explained, "a case may *not* be removed to federal court on the basis of a federal defense, including that of federal preemption." *Geddes v. Am. Airlines, Inc., 321 F.3d 1349, 1352-53 (11th Cir. 2003).* "[A] federal law may substantively displace state law under ordinary preemption but lack the extraordinary force to create federal removal jurisdiction under the doctrine of complete preemption." *Id. at 1353.* Viva's argument [*8] that there is express or conflict preemption is simply irrelevant to whether this court has subject matter jurisdiction.

The next issue is whether *§1395w-26(b)(3)* creates federal question jurisdiction because it completely preempts Williams's claims. 5 Complete preemption "must be manifest in the clearly expressed intent of Congress." *Id. at 1353.* The Supreme Court has indicated that it is reluctant to find complete preemption in "the absence of explicit direction from Congress." *Metro. Life Ins., 481 U.S. at 64.* Complete preemption rarely applies; the Supreme Court has found complete preemption in only three statutes: § 301 of the Labor Management Relations Act ("LMRA"), codified at *29 U.S.C. § 185;* § 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), codified at *29 U.S.C. § 1132(a);* and §§ 85-86 of the National Bank Act, codified at *12 U.S.C. §§ 85-86. See Harris v. Pacificare Life & Health Ins. Co., 514 F. Supp. 2d 1280, 1289 (M.D. Ala. 2007).*

5    Viva did not explicitly put forth this argument in their briefing. In fact, it explicitly stated that it was asserting express or conflict preemption. (Def.'s Resp. Br. to Remand 10.) However, because Viva argues that *§ 1395w-26(b)(3)* [*9] creates federal question jurisdiction, the court will address this argument.

Neither the Eleventh Circuit nor any other circuit has addressed whether *§ 1395w-26(b)(3)* carries complete preemptive force, but other district courts have found that it does not. *See Lassiter v. Pacificare Life & Health Ins. Co., No. 07-583, 2007 U.S. Dist. LEXIS 91970, 2007 WL 4404051, at *2-3 (M.D. Ala. Dec. 13, 2007); Bolden v. Healthspring of Ala., Inc., Nos. 07-413, 07-414, 2007 U.S. Dist. LEXIS 77950, 2007 WL 4403588, at *10 (S.D. Ala. Oct. 2, 2007); Harris, 514 F. Supp. 2d at 1296.* While one court has found that *§ 1395w-26(b)(3)* does completely preempt state law claims, *Dial v. Healthspring of Ala., Inc., 501 F. Supp. 2d 1348 (S.D. Ala. 2007),* this court joins others in declining to follow *Dial. See Lassiter, 2007 U.S. Dist. LEXIS 91970, 2007 WL 4404051, at *2; Bolden, 2007 U.S. Dist. LEXIS 77950, 2007 WL 4403588, at *10; Harris, 514 F. Supp. 2d at 1294 n.13.*

Moreover, Viva has not shown that Congress intended *§ 1395w-26(b)(3)* to be a complete preemption statute. In effectuating complete preemption under LMRA and ERISA, Congress expressly created a federal cause of action to resolve disputes. 6 *See 29 U.S.C. § 185(a)* ("Suits for violation of contracts between an employer and a labor organization representing employees [*10] in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties . . . ."); *29 U.S.C. § 1132(f)* ("The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action."). Unlike LMRA and ERISA, the MMA does not have a provision providing for a federal cause of action and only requires that federal law "shall supersede any State law or regulation . . . with respect to [Medicare Advantage] plans . . . ." *42 U.S.C. § 1395w-26(b)(3).* The plain language of *§ 1395w-26(b)(3)* does not support the conclusion that Congress intended complete preemption.

6    The Supreme Court used a different analysis to find complete preemption under the National

Bank Act and focused on the "longstanding and consistent construction of the National Bank Act as providing an exclusive federal cause of action for usury against national banks" and "the special nature of federally chartered banks." *Beneficial Nat'l Bank, 539 U.S. at 10.* Viva has not argued, and the court does not find, that this reasoning [*11] applies here.

Viva also relies heavily on *Uhm v. Humana, Inc., No. 06-185, 2006 U.S. Dist. LEXIS 41185, 2006 WL 1587443 (W.D. Wash. June 2, 2006)*, to support its claim of federal question jurisdiction. However, the court in *Uhm* did not discuss or analyze complete preemption. The issue in *Uhm* was whether plaintiffs' claims were due to be dismissed for failure to state a claim because *§ 1395w-26(b)(3)* preempted plaintiffs' tort and contract claims. *2006 U.S. Dist. LEXIS 41185, [WL] at *2.* The court's analysis focused on ordinary preemption. *Id.* Moreover, the plaintiffs in *Uhm* filed suit in federal court based on diversity jurisdiction and issues related to removal were not before the court. *Id.*

Viva's reliance on *§ 1395w-26(b)(3)* as a basis for complete preemption is unfounded. The court therefore finds this statute is not an adequate ground for removal.

## 2. Complete Preemption under *42 U.S.C. § 405(h)*

Viva also argues that *42 U.S.C. § 405(h)* completely preempts Williams's claims. Viva contends that Williams's claims "arise under" the Medicare Act and are "inextricably intertwined" with a claim for benefits, requiring Williams to exhaust administrative remedies before bringing a claim.

*Section 405(h)* of the Social Security Act provides that no "decision [*12] of the [Secretary of the Department of Health and Human Services] shall be reviewed by any person, tribunal, or governmental agency except as herein provided." *42 U.S.C. § 405(h).* Although *§ 405(h)* discusses old-age and disability claims, Congress has incorporated it into the Medicare Act, so that this provision also applies to claims under the Medicare Act. *See 42 U.S.C. § 1395ii. Section 405(g)* establishes the procedure for judicial review of claims seeking benefits and allows a party to obtain review in district court only after the Secretary of the Department of Health and Human Services has made a final decision. *Id. § 405(g).* Federal courts lack subject matter jurisdiction to hear claims for benefits arising out of a

Medicare plan unless the party has exhausted administrative remedies. [7] *Id.*

> 7   *See also 42 U.S.C. § 405(h)* ("No action against the United States, the [Secretary of the Department of Health and Human Services], or any officer or employee thereof shall be brought under *section 1331* or *1346* of Title 28 to recover on any claim arising under this subchapter.").

The Supreme Court has held that *§ 405(g)* "is the sole avenue for judicial review for all 'claims arising under' [*13] the Medicare Act." *Heckler v. Ringer, 466 U.S. 602, 615, 104 S. Ct. 2013, 80 L. Ed. 2d 622 (1984)* (citation omitted). Courts disagree on whether *Ringer* stands for the proposition that *§ 405(h)* completely preempts state law. [8] Some courts have found that *§ 405(h)* completely preempts claims arising under the Medicare Act. *See Kennedy v. Health Options, Inc., 329 F. Supp. 2d 1314, 1316 (S.D. Fla. 2004); Kelly v. Advantage Health, Inc., No. 99-362, 1999 U.S. Dist. LEXIS 6903, 1999 WL 294796, at *4 (E.D. La. May 11, 1999).* However, another court has found *Ringer* did not address whether *§ 405(h)* complete preempts state law claims because the plaintiff had brought federal claims in federal court. *Bolden, 2007 U.S. Dist. LEXIS 77950, 2007 WL 4403588 at *4 n.11.* The court doubts that *§ 405(h)* is a complete preemption statute (which would make removal in this case proper) but need not decide the issue because Williams's claims do not arise under the Medicare Act.

> 8   Interestingly, when courts list the statutes for which the Supreme Court has found complete preemption, *§ 405(h)* is not included. *See, e.g., Beneficial, 539 U.S. at 6-7; Dunlap, 381 F.3d at 1291; Harris, 514 F. Supp. 2d at 1289.*

In *Ringer,* the Supreme Court put forth two tests for determining whether a claim arises under the [*14] Medicare Act. The first is whether the claims are those "in which 'both the standing and the substantive basis for the presentation' of the claims" is the Medicare Act. *Ringer, 466 U.S. at 615* (quoting *Weinberger v. Salfi, 422 U.S. 749, 760-61, 95 S. Ct. 2457, 45 L. Ed. 2d 522 (1975)).* Because neither party contends that the standing and substantive basis for Williams's claims is the Medicare Act, the court need not evaluate this test.

The second test is whether the state law claims are "inextricably intertwined" with a denial of benefits.

*Ringer, 466 U.S. at 624.* In *Ardary v. Health Plans of Cal., Inc.,* 98 F.3d 496 (9th Cir. 1996), the heirs of a deceased Medicare beneficiary claimed the Medicare provider's failure to authorize an airlift to a larger hospital resulted in the beneficiary's death. *Ardary, 98 F.3d at 497.* The plaintiffs brought negligence and intentional tort claims. *Id.* The Ninth Circuit found that while the claim was predicated on the failure to provide a specific type of benefit -- an airlift -- the plaintiffs were "*at bottom* not seeking to recover *benefits.*" *Id. at 500.* The Ninth Circuit found "nothing in the legislative history to suggest that *[§ 405(h)]* was designed to abolish all state remedies [*15] which might exist against a private Medicare provider for torts committed during its administration of Medicare benefits . . . ." *Id. at 501.*

Here, Williams has asserted two types of claims, neither of which is, at bottom, a claim for Medicare benefits. Some of Williams's claims seek damages for Viva's failure to disenroll her from Viva's prescription plan and return her to her original prescription plan. [9] These claims are not for benefits as they involve a wholly collateral issue - Viva's failure to disenroll Williams when she requested it do so. Williams's other claims relate to the quality of insurance Viva sold Williams and what she terms Viva "negligently screw[ing] up her insurance." [10] (Pl.'s Remand Br. 10.) With these claims, Williams is not claiming that she is entitled to benefits from Viva but rather is challenging the poor quality of product that Viva provided to her. Moreover, her claim is not one for benefits because Williams would not be made whole if Viva paid her benefits. Williams seeks redress for her injury resulting from Viva's failure to disenroll her and the anguish she experienced as a result of not knowing the status of her insurance. [11]

> 9    These are her claims [*16] in Count II for negligence, Count III for wantonness, Count IV for outrage, and Count V for breach of contract. (Compl. P P 26-43.)
> 10    These are her claims in Count I for negligent failure to procure insurance and Count V for negligent hiring, training, and supervision. (Compl. PP 21-25, 44-47.)
> 11    After Williams commenced the lawsuit, Viva agreed to provide her prescription drug benefits beyond the $ 3,000 maximum through October 2007. (Mot. Remand Ex. F.)

Even if *§ 405(h)* were to completely preempt claims

under state law, Williams's claims are not completely preempted because they do not arise under the Medicare Act. Accordingly, removal in reliance upon *§ 405(h)* was improper.

### B. Substantial Federal Issue

Viva argues, in the alternative, that there is federal question jurisdiction because embedded in Williams's claims arising under state law are substantial issues of federal law. Viva argues there are three such issues, but these issues are actually preemption defenses. [12] Because Williams's claims do not contain substantial embedded issues of federal law, removal on this ground was inappropriate.

> 12    The three issues are: (1) whether Viva can be liable under state law for not discouraging [*17] her from enrolling when federal law prohibits health screening; (2) whether VIVA can be liable under state law for insufficient marketing materials when the materials comply with federal law; and (3) whether Williams must have exhausted federal administrative remedies for challenging coverage decisions in order to bring her state law claims. (Notice of Remand P 23.)

In certain cases federal question jurisdiction lies over claims arising under state law that "turn on substantial questions of federal law." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 312, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005). The Supreme Court has long recognized this type of federal question jurisdiction, *id.,* although this category of cases is "special and small." *McVeigh,* 126 S. Ct. at 2136. The mere presence of a federal issue "does not automatically confer federal-question jurisdiction." *Merrell Dow Pharms. Inc. v. Thompson,* 478 U.S. 804, 813, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986). To determine whether a state law claim arises under federal law, a court must determine whether "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved [*18] balance of federal and state judicial responsibilities." *Grable,* 545 U.S. at 314.

In *Grable,* the Supreme Court determined that removal was proper because the resolution of the claims arising under state law depended on the interpretation of a disputed federal statute. *Id. at 319-20.* The IRS had seized real property belonging to Grable to satisfy a tax

delinquency, and though Grable received notice at that time of the seizure by mail, he brought a quiet title action under state law a few years later, claiming that the IRS's notice was insufficient under federal law. *Id. at 310-11.* The defendants removed the case to federal court, claiming there was federal question jurisdiction. *Id. at 311.*

The Supreme Court found there was a disputed federal question embedded in Grable's quiet title action because his claim of superior title depended on a federal issue -- the adequacy of the IRS's notice under federal law. *Id. at 314-15.* The disputed issue was substantial as it would be dispositive for other cases in the future. *Id. at 315.* Notably, it was the only disputed legal or factual issue in the case. *Id.* Finally, the Supreme Court found that federal court resolution of the issue would not upset [*19] the balance between the state and federal systems because the federal government had a strong interest in collecting taxes, in having a federal forum available to vindicate its own administrative actions, and because only rarely would title cases arising under state law implicate federal tax law. *Id.*

A year after *Grable,* the Supreme Court in *McVeigh* reinforced that there is a substantial question of federal law in only a "special and small category" of cases. *McVeigh, 126 S. Ct. at 2136.* In *McVeigh,* a health insurance carrier for federal employees sought reimbursement from an enrollee for damages recovered in a state tort action. *Id. at 2129.* Using the same analysis as in *Grable,* the Supreme Court concluded that it lacked subject matter jurisdiction because the disputed issue in *McVeigh* did not have a federal character as it involved the settlement of a state court action. *Id. at 2137.* The Court explained the issue was not substantial by contrasting it to the one in *Grable.* While the issue in *Grable* was "a nearly pure issue of law . . . that could be settled once and for all and thereafter would govern numerous tax sale cases," *id.* (internal quotation marks and citation omitted), the [*20] issues in *McVeigh* were "fact-bound and situation-specific." *Id.* Finally, the Court found that the federal-state balance weighed against federal question jurisdiction as the state court "is competent to apply federal law, to the extent it is relevant." *Id.* While the United States has an interest in the health and welfare of its employees, the interest did not justify turning the claim into a federal case. *Id.*

Here, there is not a substantial question of federal

law embedded in Viva's claims. First, there is no disputed issue of federal law embedded in Williams's claims. The disputed federal issue in *Grable* regarding the adequacy of notice was an element of the *plaintiff's* claim under state law. *See Grable, 545 U.S. at 314.* That is not the case here. Viva is merely asserting preemption defenses to the Williams's state law claims.

Second, even assuming there were disputed issues of federal law, they would not be substantial. Although Viva claims there are substantial issues, there is no support for this contention. Viva has not shown that the issues are pure issues of law or that the resolution of this case would be determinative for others in the future.

Finally, deciding this case in federal [*21] court would upset the balance between the state and federal systems. Viva asserts that Congress intended there to be a federal forum because it preempted state law. However, because ordinary preemption does not give rise to federal question jurisdiction, the court cannot infer that Congress intended there to be a federal forum. State courts are well-equipped to decide whether federal law preempts state law, as these issues are regularly litigated in state courts. Moreover, an exercise of federal jurisdiction here would upset the balance between the state and federal systems by moving an entire class of cases -- those that raise preemption defenses -- into federal court.

Viva has argued that its preemption defenses are embedded issues of federal law. However, substantial issues of federal law create federal question jurisdiction in only a small class of cases, and this case is not one of them. [13] Accordingly, Viva's removal on this ground was inappropriate. Because there is not federal question jurisdiction, this case is due to be remanded to state court.

> 13    The parties have also argued whether *42 U.S.C. § 1395* prohibits this court from ruling on issues related to Medicare because it limits [*22] federal oversight over the practice of medicine. That statute provides:
>
> > Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any

officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

*42 U.S.C. § 1395. Section 1395* is plainly inapplicable to the issues before the court in this case.

### C. Attorney Fees

In her motion to remand, Williams argues that she is entitled to costs and attorney fees under *28 U.S.C. § 1447(c)* because Viva acted in bad faith in removing this action. "An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." *28 U.S.C. § 1447(c)*. "[C]ourts may award attorney's fees under *§1447(c)* only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, [*23] fees should be denied." *Martin v. Franklin Capital Corp., 546 U.S. 132, 141, 126 S. Ct. 704, 163 L. Ed. 2d 547 (2005)*. A trial court should not grant attorney fees simply because the effort to remove a case failed. *Sheridan Healthcorp., Inc. v. Neighborhood Health P'ship, Inc., 459 F. Supp. 2d 1269, 1274 (S.D. Fla. 2006)*.

Viva used a reasonable ground for removal when it asserted that there was complete preemption. "Complete preemption is not a simple concept." *Harris, 514 F. Supp. 2d at 1298*. In *Harris*, the court did not award costs or attorney fees when the defendant removed a case claiming complete preemption under *§ 1395w-26(b)(3)* because the issues were novel and had not been addressed by the Eleventh Circuit. *Id.* Here, the complete preemption issues were complex and had not been addressed by the Eleventh Circuit. Because Viva's removal on this ground was objectively reasonable, awarding costs or attorney fees would be inappropriate. Therefore, Williams's request for attorney fees will be DENIED.

### IV. CONCLUSION

Accordingly, it is ORDERED that:

1. Plaintiffs' Motion to Remand (Doc. # 14) is GRANTED;

2. This case is REMANDED to the Circuit Court of Bullock County;

3. The Clerk is DIRECTED to take appropriate steps to effect [*24] the remand; and

4. The plaintiff's request for costs and attorney fees is DENIED.

DONE this 25th day of January, 2008.

/s/ W. Keith Watkins

UNITED STATES DISTRICT JUDGE